FILED
United States Court of Appeals
Tenth Circuit

April 19, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

POLLY A. WILSON,

        Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security Administration,

        Defendant-Appellee.

No. 08-3325
(D.C. No. 6:07-CV-01147-JTM)
(D. Kan.)

**ORDER**

Before **HENRY**, Chief Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**,
Circuit Judge.

The Appellee has filed a motion to publish the order and judgment
previously issued on February 17, 2010. The motion is GRANTED. The
published opinion is filed nunc pro tunc to that date, and a copy is attached.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

February 17, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

POLLY A. WILSON,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security Administration,

Defendant-Appellee.

No. 08-3325

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS
### (D.C. No. 6:07-CV-01147-JTM)

Submitted on the briefs:[*]

David H.M. Gray, Gragert, Hiebert, Gray & Link, Wichita, Kansas, for
Plaintiff-Appellant.

Marietta Parker, Acting United States Attorney, Anne M. Mackland, Special
Assistant United States Attorney, Kristi A. Schmidt, Chief Counsel, Region VII,
Social Security Administration, Kansas City, Missouri, for Defendant-Appellee.

Before **HENRY**, Chief Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**,
Circuit Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is
therefore ordered submitted without oral argument.

**BRORBY**, Senior Circuit Judge.

Plaintiff-appellant Polly A. Wilson appeals from an order of the district court affirming the Commissioner's decision denying her applications for Social Security disability and for Supplemental Security Income benefits (SSI). Ms. Wilson alleged an disability onset date of June 26, 1998. Her date last insured was December 31, 2002; thus she had the burden of proving that she was totally disabled on that date or before. *See Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993) (holding the claimant "must prove she was totally disabled prior to [the date her insured status expired]"). The agency denied her applications initially and on reconsideration.

On August 16, 2005, Ms. Wilson received a de novo hearing before an administrative law judge (ALJ). The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

> Step one requires the claimant to demonstrate that he is not presently engaged in substantial gainful activity. At step two, the claimant must show that he has a medically severe impairment or combination of impairments. At step three, if a claimant can show that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits. If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work.

If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy, given her age, education, and work experience. If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotation marks and citations omitted; brackets in original).

In his October 12, 2005, decision, the ALJ determined that Ms. Wilson was not presently engaged in substantial gainful activity and that she did have a medically severe combination of impairments, including the following severe impairments: degenerative disc disease of the cervical and lumbar spine, mitral valve prolapse, history of carpal tunnel, depression, personality disorder, somatoform disorder, and methamphetamine abuse. Admin. R., Vol. I at 22. At step three, the ALJ determined that Ms. Wilson's combination of impairments did not meet or equal a listed impairment. The ALJ determined that she retained the RFC to perform a range of light activities and was physically "limited to lifting or carrying 10 pounds frequently and 20 pounds occasionally, sitting about 6 hours in an 8 hour work day, and standing or walking about 6 hours in an 8 hour work day." *Id*. at 23. The ALJ also determined that Ms. Wilson's mental limitations "include moderate limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and get along with

coworkers or peers without distracting them or exhibiting behavioral extremes."

*Id.* With this RFC, the ALJ found that Ms. Wilson could return to her past relevant work as a phlebotomist, and that even if she could not return to her past relevant work, there were a significant number of other jobs which she could perform in the national or regional economy. The ALJ therefore held that Ms. Wilson had not been under a disability from the alleged date of onset to the date of the ALJ's decision. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision.

On appeal, Ms. Wilson raises five points of error: (1) the ALJ failed to properly consider her psychotic disorder in determining her RFC; (2) the ALJ failed to properly consider her myofascial pain syndrome in determining her RFC; (3) the ALJ erroneously evaluated her credibility; (4) the ALJ improperly evaluated several treating source opinions; and (5) the district court erred by failing to remand the case to the agency for consideration of new and material evidence.

> Under the Social Security Act, the Social Security Administration (SSA) is authorized to pay disability insurance benefits and Supplemental Security Income to persons who have a "disability." A person qualifies as disabled, and thereby eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

*Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B)). "Under the Social Security Act, a claimant is disabled if she is unable to do 'any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months.'" *Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009) (quoting 20 C.F.R. § 416.905(a)) (ellipsis in original). We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (quotation omitted). We review the district court's denial of Ms. Wilson's motion for remand for an abuse of discretion. *See Clem v. Sullivan*, 894 F.2d 328, 332 (9th Cir. 1990).

## I.

Ms. Wilson has a long history of drug addiction and mental illness. Her first argument is that the ALJ failed to properly consider her psychotic disorder in determining her RFC. Her psychotic disorder was first diagnosed on October 27, 2003, by Cathy Shaffer, a therapist for High Plains Mental Health Center (High Plains). Admin. R., Vol. I at 376. The diagnosis was confirmed by evaluations

performed by Dr. Susan Harper at High Plains on December 18, 2003; January 13, 2004; and January 26, 2004. *Id*. at 371-74. The ALJ did not find her psychotic disorder to be severe at step two of the sequential evaluation. But the ALJ was still required to give consideration to the disorder because, in determining RFC, an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]" 20 C.F.R. §§ 404.1545(e), 416.945(e); *see also* S.S.R. 96-8p, 1996 WL 374184, at *5.

Ms. Wilson does not argue that the record shows specific limitations caused by her psychotic disorder that should have been included in the RFC. She instead argues that the decision shows the ALJ ignored her psychotic disorder. She argues that this insufficient consideration is shown by the ALJ's failure to identify which of her limitations were caused by the psychotic disorder, his failure to find the psychotic disorder a severe mental impairment at step two, and his failure to discuss certain evidence concerning the symptoms of her disorder.

When considering mental impairments, the ALJ must properly apply the special technique required by the regulations.

> When there is evidence of a mental impairment that allegedly prevents a claimant from working, the ALJ must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. §§ 404.1520a and the Listing of Impairments and document the procedure accordingly. This procedure requires the ALJ to rate the degree of the claimant's functional limitation based on the extent to which the claimants mental impairment(s) interferes with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. Previously, to record his

-6-

conclusions, the ALJ prepared a standard document called a Psychiatric Review Technique Form (PRT form) that tracked the listing requirements and evaluated the claimant under the relevant criteria. Now, he is only to document application of the technique in the decision.

*Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008) (quotations, citations, and alterations omitted).

Here the ALJ applied the special technique and rated Ms. Wilson's functional limitations by essentially following the conclusions of Dr. Charles Frantz, a consulting physician, contained in two PRT forms from August 29, 2003, prior to the diagnosis of psychotic disorder.[1] The ALJ found that Ms. Wilson had a severe combination of mental impairments, concluding that "claimant has no restrictions in daily activities, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace without evidence of repeated episodes of decompensation." Admin. R., Vol. I at 22.

In determining Ms. Wilson's RFC, the ALJ tracked the findings in Dr. Franz' Mental RFC Assessment, also from August 29, 2003.[2] The ALJ

---

[1]    We note that there are two other PRT forms in the record: one from April 29, 2000, and one from March 8, 2001. Neither of these forms rates any of Ms. Wilson's functional limitations as greater than moderate.

[2]    The ALJ's decision stated that he was "in general agreement with the medical opinions of the State agency medical consultants regarding the claimant's ability to do work-related activities." *Id.* at 23. He explicitly noted that "[a]lthough they did not examine the claimant, they provided specific reasons for

(continued...)

-7-

included the following mental limitations in the RFC: "moderate limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes." *Id.* at 23. Despite the fact that the ALJ tracked a Mental RFC Assessment that was completed prior to Ms. Wilson's psychotic disorder diagnosis, he did take that disorder diagnosis into account. He simply determined that the diagnosis did not affect Ms. Wilson's level of functionality.

First, although Dr. Franz initially completed the PRT forms and the Mental RFC Assessment, both the forms and the assessment were reconsidered and *affirmed* by a second doctor, Dr. R.E. Schulman, on March 31, 2004, *after* the psychotic disorder diagnosis by High Plains. The ALJ was clearly aware of this reconsideration in that, immediately after expressing his agreement with the agency medical consultants, he specifically stated: "[t]he undersigned finds that evidence received into the record *after the reconsideration* did not provide any new or material information that would alter any finding about the claimant's residual functional capacity." *Id.* (emphasis added). Second, in specifically discussing the High Plains psychotic disorder diagnosis, the ALJ noted that,

---

[2](...continued)
their opinions about the claimant's residual functional capacity showing that they were grounded in the evidence in the case records, including careful consideration of the claimant's allegations about symptoms and limitations." *Id.* at 23.

despite the additional diagnosis, High Plains did not reduce its rating of Ms. Wilson's global assessment of functioning (GAF) from 60.[3]  *Id*. at 20.  In other words, it is clear that although High Plains adjusted Ms. Wilson's diagnosis *after* Dr. Franz' assessments, the center did not believe that Ms. Wilson's level of functioning was adversely affected by the additional diagnosis.

Thus, although the ALJ did not go into the specifics about the symptoms that led to the psychotic disorder diagnosis, he made the findings required by 20 C.F.R. § 404.1520a, and considered the psychotic disorder diagnosis in doing so.  Those findings were supported by substantial evidence in that the ALJ agreed with the findings of the agency medical consultants, including the reconsideration after the psychotic disorder diagnosis, and noted that, according to the clinicians who made the additional diagnosis, it did not have an impact on Ms. Wilson's level of functioning.

---

[3]     The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32.  A GAF score of 51-60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning."  *Id*. at 34.

II.

In her second point, Ms. Wilson claims that the ALJ also failed to properly consider her myofascial pain syndrome diagnosis in determining her RFC.[4] On October 13, 2003, Ms. Wilson underwent a neuromuscular examination by Dr. April McVey. Dr. McVey's impression following the examination was:

> I believe that this patient has myofascial pain syndrome.
> I understand that she is filing for Social Security Disability. I did explain to the patient that without any objective abnormalities on her neurological examination or on the electrodiagnostic studies, she probably will not receive approval from Social Security for disability.

Admin. R., Vol. II at 683. This diagnosis was noted by the ALJ in his decision: "Dr. McVey noted possible myofascial pain syndrome and advised the claimant that without any objective abnormalities on her neurological examination [or] on the electrodiagnostic studies, she would probably not receive approval from Social Security for disability." *Id.*, Vol. I at 20.

Doctors at the Hays Orthopaedic Clinic (Hays) had also previously diagnosed Ms. Wilson with myofascial pain syndrome. She had been treated by Hays for some time for complaints of back, neck, shoulder, and arm pain. On March 18, 2003, the physician's assistant and doctor who had been treating her

---

[4] "'Myofascial syndrome,' also known as 'myofascial pain syndrome' is defined as 'irritation of the muscles and fasciae (membranes) of the back and neck causing chronic pain (without evidence of nerve or muscle disease).'" *Smith v. J.I. Case Corp.*, 163 F.R.D. 229, 231 (E.D. Pa. 1995) (quoting *Schmidt's Attorneys' Dictionary of Medicine* M-323 (1978)).

-10-

noted that they had been seeing Ms. Wilson for several months and had not made any gains with rehabilitation despite her nerve conduction and MRI test results being "essentially normal for the most part." *Id*., Vol. II at 579. They decided to have Dr. Smith evaluate Ms. Wilson, which he did on March 24, 2003.

Dr. Smith stated in his report: "I believe this lady essentially has a chronic pain syndrome that seems to fit more into a pattern of fibromyalgia." *Id*. at 577. After another visit, Dr. Smith decided to have Dr. Mizra Baig examine Ms. Wilson, because of her claim of severe neck pain, "for an opinion to see if there is any other treatment that may be of benefit including surgery." *Id*. at 576. Dr. Baig diagnosed Ms. Wilson with a cervical strain and myofascial pain syndrome. She then returned to Dr. Smith who noted that "Dr. Baig . . . could not find any good organic reason for her pain and thought it was mostly myofascial." *Id*. at 572. He also noted that Ms. Wilson told him that she was diagnosed at one time with chronic fatigue syndrome. *Id*. Dr. Smith last saw Ms. Wilson on June 6, 2003, when his final diagnosis was "[c]hronic pain syndrome with multiple musculoskeletal complaints including myofascial pain." *Id*. at 570.

Ms. Wilson complains that the ALJ erred in stating that Dr. McVey considered myofascial pain syndrome a "possibility." We see no error with this statement or with the ALJ's treatment of her myofascial pain syndrome. Although Ms. Wilson complained of severe pain in her back and neck, which sometimes radiated to pain in other areas, multiple clinical tests were unable to find a

-11-

physical cause for that level of pain. Thus, the record contains diagnoses of chronic pain syndrome, myofascial pain syndrome, and fibromyalgia. Further, she self-reported being diagnosed at one time with chronic fatigue syndrome, and she was also diagnosed with the somatoform disorder characterized by "[p]sychological factors contributing to perception of pain," *id*. at 640. The fact that the various doctors often qualified their diagnoses with the word "believe" simply reflects the fact that complaints of severe pain that do not readily lend themselves to analysis by objective medical tests are notoriously difficult to diagnose and treat, and the diagnoses themselves are often overlapping. *See Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998) ("[N]o one questions that fibromyalgia is very difficult to diagnose, that no objective medical tests reveal its presence, and that it can be completely disabling."); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("[F]ibromyalgia [is] also know as fibrositis-a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features."); *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993) ("At this point there is no 'dipstick' laboratory test for chronic fatigue syndrome."); *Stanistreet v. Chater*, 21 F. Supp. 2d 1129,

1133 n.11 (C.D. Cal. 1995) (citing 2 *Schmidt's Attorneys' Dictionary of Medicine* at M-323 (1995 ed.), in determining that "[m]yofascial syndrome describes a condition very similar to fibromyalgia and fibrositis").

Further, Ms. Wilson argues that the fact that the ALJ noted Dr. McVey's statement that she "advised the claimant that without any objective abnormalities on her neurological examination [or] on the electrodiagnostic studies, she would probably not receive approval from Social Security for disability," Admin. R., Vol. I at 20, shows that the ALJ's finding of disability was based on the negative neurological testing. This is pure speculation. The ALJ might have referenced Dr. McVey's statement in its entirety simply because the diagnosis was so short. Or, more likely, the ALJ included the reference to the negative neurological testing to provide another example of Ms. Wilson expressing to a clinician her desire to obtain social security disability benefits, which, as will be discussed further *infra*, was a factor the ALJ considered in assessing credibility. It is clear from the decision, taken as a whole, that the ALJ was aware that a claimant's pain may be considered disabling despite the absence of neurological testing objectively showing a reason for such pain. Thus, we must turn to Ms. Wilson's credibility argument.

III.

In her third point, Ms. Wilson claims the ALJ erred in evaluating her testimony. To the extent Ms. Wilson is trying to argue that there was not substantial evidence to support the ALJ's determination that she was not entirely credible, we disagree.

> "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. [Sec'y] Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston* [*v. Bowen*], 838 F.2d [1125,] 1133 [(10th Cir. 1988)] (footnote omitted); *see also Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) (ALJ "must articulate specific reasons for questioning the claimant's credibility" where subjective pain testimony is critical); *Williams* [*ex rel.*] *Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988) ("failure to make credibility findings regarding . . . critical testimony fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support [her] conclusion that claimant is not under a disability").

*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

There can be no doubt that Ms. Wilson's testimony was not entirely credible. Even the briefest review of the record reveals a number of instances of deception concerning her drug use and other topics. The ALJ's decision points out a number of these instances of misrepresentation, and the record contains many more. We thus hold that there was substantial evidence to uphold the ALJ's general negative credibility determination.

-14-

As we read Ms. Wilson's briefs, however, her argument is not so much that her testimony was credible as a whole, but that the ALJ drew incorrect inferences from her non-credible testimony. We must therefore look at the specific credibility findings made by the ALJ, beginning with his credibility finding as to Ms. Wilson's claims of disabling pain. Ms. Wilson argues that the ALJ failed to properly analyze her claims of disabling claims.

> "The framework for the proper analysis of Claimant's evidence of pain is set out in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987). We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling."

*Branum v. Barnhart*, 385 F.3d 1268, 1273 (10th Cir. 2004) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993)). We have held that, in determining whether the claimant's subjective complaints of pain are credible, the ALJ should consider various factors, such as:

> "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence."

*Id*. at 1273-74 (quoting *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)).

Here the ALJ found that Ms. Wilson's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms. However, the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." Admin. R., Vol. I at 23. Ms. Wilson argues that the ALJ gave no consideration to "the possibility that psychological disorders combine with physical problems" when he evaluated her pain. Aplt. Opening Br. at 18-19 (quoting *Luna*, 834 F.2d at 166). She argues that "[t]here were at least two psychiatric disorders that affect [her] pain, physical functioning, perceptions of her health, and other aspects of her credibility" and that "[a]n evaluation of her pain and her credibility without specifically discussing those disorders as they relate to her pain and credibility is fatally incomplete." *Id*. at 20.

Ms. Wilson first discusses her psychotic disorder. To the extent Ms. Wilson is arguing that her lack of credibility may be attributed to a psychotic break with reality, we see no evidence in the record to support such a claim. The few periods in time discussed in the record where an argument might be made that Ms. Wilson had a loose grip on reality are unrelated to the negative credibility findings made by the ALJ. Further, she was clearly lucid at the hearing before the ALJ.

It is possible that Ms. Wilson is arguing that her mental impairments in combination, including her psychotic disorder, led her to experience disabling

-16-

pain despite the lack of objective medical evidence of a medically determinable physical impairment that would cause such pain. It is clear that various clinicians recognized that Ms. Wilson's testable physical impairments were not of sufficient severity to account for her complaints of extreme pain–hence the diagnoses of somatoform disorder, fibromyalgia, pain disorder, etc. But even if Ms. Wilson's level of pain was greater due to these untestable conditions, the question still remains whether her complaints of *disabling* pain were credible. In finding they were not, the ALJ did not rely merely on the absence of a testable physical impairment that would cause such disabling pain. He also relied on evidence showing that some of Ms. Wilson's treating physicians thought she was more interested in obtaining disability benefits than in trying to find work she could do, that she at times behaved as if she had no disabling pain, and that her non-credible statements were not confined to her complaints of pain.

It is clear that Ms. Wilson was seeking disability benefits. But it is obvious that seeking benefits does not lead to an adverse credibility finding; people who are unable to work need and are entitled to such benefits. While this was Ms. Wilson's third application for disability benefits and she had also filed a medical malpractice claim and workers compensation claims, and while at least one doctor was more than skeptical about her disability claim,[5] such evidence

---

[5]     On July 30, 2003, Dr. Victor Eddy, who was evidently Ms. Wilson's primary care physician at the time, wrote:

(continued...)

-17-

standing alone would be insufficient to support an adverse credibility finding as to a subjective pain complaint.

This was not, however, the only evidence relied upon by the ALJ. He also noted that while Ms. Wilson did take prescription medications, she did not take prescription strength pain relief medication despite her claims of disabling pain. He also noted that her description of her daily activities did not indicate significant limitations. Although she testified that she had severe pain in her back and neck, her description of her activities of daily living "indicated the ability to care for herself, her home and her children." Admin. R., Vol. I at 21. Ms. Wilson stated that she was able to drive, shop, and handle finances; that gardening was a hobby; and that she visited friends and ate out.

---

[5](...continued)
> She is seen and is bound and determined to get Social Security Benefits. She demands to know why she has pain. . . . She does not appear disabled. She said she is stressed out and cannot take care of children and work at same time. That is why she will not work and she will demand Social Security Benefits. She wants to see a doctor who will give her this solution to her problems. . . . I therefore committed to find a person to see her as I think probably most of the physicians in [town] have told her to get her act together, get her life together and quit relying on Social Security to solve her problems.

Admin. R., Vol. II at 603. On November 19, 2003, Dr. Eddy wrote: "[Ms. Wilson] is on a quest for disability, social security and now HUD Housing." *Id*. at 600. Nevertheless, despite Dr. Eddy's apparent skepticism, he "[gave] her a note that she can release to who[]ever she wishes, which states that she should consider [sic] to be disabled until her physical and emotional problems can be addressed." *Id*.

Further, the ALJ noted that Ms. Wilson's statements regarding her limitations were not always credible. She testified that she could not use her hands but also testified that she, at one point, wrote a county attorney a fifteen-page letter. Likewise, she testified that she was limited to sitting no longer than thirty minutes or standing no longer than thirty minutes, a claim inconsistent with the stated limitation that she was not allowed to drive for longer than ninety minutes and also inconsistent with the fact that, during the sixty-five-minute hearing, the ALJ noticed no position alteration or obvious discomfort by Ms. Wilson and no appearance of pain when she left the hearing. Such evidence undermines Ms. Wilson's claims of a *disabling* level of pain, no matter the source.

Further, Ms. Wilson testified at the hearing that one of the reasons she wanted to obtain disability benefits was that she wanted to be able to spend time taking care of her youngest son who suffered from night terrors. The record shows that she also provided this reason for seeking disability in her disability filings as well as relating it to various clinicians. This provides another motive for misrepresentation of her disability. Finally, the ALJ noted that the record showed various discrepancies regarding Ms. Wilson's substance abuse. Her misrepresentations as to the use of alcohol and exactly when she quit taking drugs was properly taken into account when considering her overall credibility.

Consequently, the ALJ's determination that Ms. Wilson's testimony of *disabling* pain was not credible was supported by substantial evidence.

IV.

In her fourth point on appeal, Ms. Wilson claims that the ALJ improperly evaluated several treating source opinions. She first claims that the ALJ's RFC determination ignored the physical limitations set forth in two work releases given in January and May of 2003 by two doctors at Hays. While it is true that the releases contained more significant restrictions than did the eventual RFC determination, the releases were also inconsistent with each other. Further, the RFC generally agreed with the findings of a later physical RFC assessment performed by an agency consultant on December 11, 2003. In turn, in finding that Ms. Wilson had minimal limitations, the doctor performing the physical RFC assessment relied heavily on the findings of a consultative physical examination performed on December 2, 2003, by Dr. Smith, the same Hays doctor who was responsible for the second, May 2003 work release. That physical RFC assessment also specifically discussed the limitations contained in Dr. Smith's May 2003 release, but suggested that those limitations were not supported by the rest of the medical record and should not be given controlling weight.

The ALJ, then, specifically noted in his decision that the agency consultants "provided specific reasons for their opinions about the claimant's [RFC] showing

that they were grounded in the evidence in the case records." Admin. R., Vol. I at 23. Thus, it is clear that the ALJ did not ignore the earlier work releases.

Ms. Wilson next complains that the ALJ mischaracterized Dr. Smith's December 2003 consultative examination by stating in his decision that the examination found "minimal limitations," *id.* at 19, or "no significant limitations," *id.* at 25, and that the ALJ's statement that the limitations noted in Dr. Smith's earlier work release "appear[ed] to be based on [Ms. Wilson's] subjective complaints," *id.*, was impermissible speculation. It appears that these statements were merely referencing the absence of objective medically testable physical impairments, not concluding that such an absence was dispositive. The substantive question was whether the pain that was not susceptible to measurement by objective medical tests was disabling. As noted above, the ALJ followed the proper procedures in determining that it was not disabling.

Ms. Wilson next makes a brief argument complaining of the following analysis by the ALJ:

> Although the claimant obtained disability assessments in 2000 and 2001 in connection with the malpractice suit, these are given little or no weight. . . . Dr. Atkinson provided an opinion of disabled in March 2001 in connection with the malpractice claim based on projections for the need for additional abdominal surgeries limiting work. However, this did not occur.

Admin. R., Vol. I at 24 (citations omitted). Ms. Wilson argues that

Dr. Atkinson's disability assessment was not "based on projections for the need

for additional abdominal surgeries limiting work." We disagree. Dr. Atkinson wrote:

> [B]ased upon Dr. Bauer's description of adhesion formation at the time of laparoscopy, this patient will have symptoms of abdominal adhesions for the duration of her life. And she will probably have to have multiple abdominal operations for pain, intestinal obstruction, etc. These adhesions and the resulting pain have caused her permanent disability in the loss of normal range of motion and physical activity. This in my opinion renders her unable to pursue any gainful employment.

*Id.*, Vol. II at 538. Ms. Wilson does not argue the fact that Dr. Bauer was incorrect in 2001 when he predicted that she would experience chronic abdominal adhesions requiring multiple future operations for pain, intestinal obstruction, and other side effects. She is apparently arguing that, although she did not develop symptoms requiring future operations, she still experienced chronic adhesions that were somehow disabling. But she does not cite to any portion of the record to support this implicit assertion, and she barely mentioned her malpractice suit in her testimony before the ALJ and made no reference to any chronic abdominal adhesions.

Finally, Ms. Wilson complains that the ALJ ignored the following medical opinions given by care-givers at High Plains in 1999 and 2003. On August 25, 1999, a High Plains therapist included, as part of an "entry referral report," the following: "There is a pervasive pattern of interpersonal deficits characterized by impulsivity, poor judgement, many failed romantic relationships, three children by

-22-

three different fathers, and inability to sustain consistent work behavior." *Id.*,

Vol. I at 423-24. On August 4, 2003, another therapist included, as part of an

"entry report": "The secondary diagnosis of Personality Disorder Not Otherwise

Specified is given as there appears to be a pervasive pattern of interpersonal and

cognitive deficits that is of a longstanding nature and has led to problems in the

areas of impulse control, work behavior, interpersonal relationships, and

self-image." *Id.* at 379. There is nothing to show that the ALJ failed to properly

consider these records in issuing his decision. There is obviously no requirement

that the ALJ reference everything in the administrative record. *See Wall*,

561 F.3d at 1067 ("The ALJ is not required to discuss every piece of evidence.")

(further quotation omitted). Further, there is no question that Ms. Wilson has

serious long-term mental health limitations that clearly impact her life. The

question is whether the limitations are so great that Ms. Wilson is permanently

disabled. Neither of these records reaches or supports such a conclusion.

V.

Finally, Ms. Wilson argues that the district court erred by failing to remand

her case to the agency for consideration of new and material evidence under

sentence six of 42 U.S.C. § 405(g). On January 21, 2008, Ms. Wilson submitted a

motion to the district court to supplement her brief to add two exhibits and to

argue that remand was necessary. Under § 405(g):

-23-

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

The exhibits in question were a letter dated October 18, 2007, and a statement supplementing that letter dated January 15, 2008, both by Ann Young, a therapist at High Plains who had treated Ms. Wilson since July 2004, prior to the ALJ's decision. The district court granted the motion and considered the documents, but found they "justifie[d] neither reversal nor remand" for a number of reasons.

Evidence is material if "'the Secretary's decision might reasonably have been different had the [new] evidence been before him when his decision was rendered.'" *Cagle v. Califano*, 638 F.2d 219, 221 (10th Cir. 1981) (quoting *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)) (alteration in original). Here, it is at least arguable that the exhibits are material as, in both, Ms. Young gives her opinion that Ms. Wilson was disabled by her mental limitations during the relevant time period. Next, while the exhibits themselves are technically new, in that they were written in October 2007 and January 2008, the evidence in the exhibits is considered derivative evidence to the extent that Ms. Young's conclusions were based solely on evidence already in the administrative record. *See Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).

Ms. Wilson argues, however, that the therapy with Ms. Young that occurred *after* the ALJ's hearing led to a greater understanding of Ms. Wilson's condition

and to Ms. Young's subsequent disability conclusion. Consequently, we must consider whether there was good cause for the failure to present Ms. Young's disability opinion during the agency proceedings.

Although the district court did not base its denial on failure to show good cause, that does not prevent this court from doing so if we conclude, as we do, that it would have been an abuse of discretion for the district court to have granted a remand in this case. *See Ashby v. McKenna*, 331 F.3d 1148, 1151 (10th Cir. 2003) (holding that "with respect to a matter committed to the district court's discretion, we cannot invoke an alternative basis to affirm unless we can say as a matter of law that it would have been an abuse of discretion for the trial court to rule otherwise" (quotation omitted)).

Here, the ALJ's decision was handed down in October 2005. The Appeals Council denied review at the end of March 2007. Although the letter, addressed to "To Whom It May Concern," and the statement, drafted by Ms. Wilson's counsel, were clearly prepared with Ms. Wilson's social security claim in mind, the only reason given for a failure to obtain and present such evidence sooner was that "[s]ubsequent treatment and her most recent period of abstinence from drug abuse has greatly increased [the mental health center's] understanding of Ms. Wilson." Admin. R., Vol. III at 995. But there is nothing to support this statement.

Why did Ms. Wilson's "most recent period of abstinence," which started a week before the hearing before the ALJ, "greatly increase" the understanding of Ms. Wilson's mental condition during the period of alleged disability, when her earlier period of abstinence evidently did not? The last High Plains' medical records in the administrative record run from October 2003 through January 2004. At that time, according to Ms. Wilson's hearing testimony, she had not used drugs since April 2001 and did not relapse until December 2004. Although the ALJ pointed out that she had been discharged from treatment by one of her doctors because of suspected drug use in October 2002, that would still mean that she had been sober for a year before her late 2003-through-early 2004 round of treatment at High Plains. Further, even if there *was* some treatment breakthrough after Ms. Wilson regained sobriety in August 2005, why was that breakthrough not related to the Appeals Council? It denied review in March 2007 and, according to Ms. Young, she had been treating Ms. Wilson for almost three years at that point.

"[W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). Allowing a claimant to hold opinion evidence as to her limitations to present to the district court in the first instance would seriously undermine the regularity of the agency process and is not allowed. *See Bradley v. Califano*, 573 F.2d 28, 30

(10th Cir. 1978) ("'Good cause' is more than a desire to relitigate the same issues."). As Ms. Wilson failed to show why she could not have obtained and submitted Ms. Young's opinions to the ALJ or, at the least, the Appeals Council, she failed to show good cause for a remand. *See Cummings v. Sullivan*, 950 F.2d 492, 500 (7th Cir. 1991) (stating that § 405(g) "require[s] good cause for a failure to submit new evidence to the ALJ *and* the Appeals Council").

## VI.

The judgment of the district court is AFFIRMED.