**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 24, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LEONARD R. GARCIA,

　　Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

　　Defendant - Appellee.

No. 19-6107
(D.C. No. 5:18-CV-00546-P)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

Leonard Garcia appeals the district court's order affirming the denial of

disability insurance benefits (DIB) and supplemental social security income (SSI).

Exercising jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

**BACKGROUND**

Garcia applied for DIB and SSI in 2015, alleging he had been disabled since

January 1, 2012, due to degenerative disc disease in his lumbar spine, degenerative

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

joint disease and rotator cuff tendinosis in his right shoulder, and arthritis in his hands and shoulders. He was insured through December 31, 2015, and therefore had the burden of showing he was disabled on or before that date. *See Wilson v. Astrue,* 602 F.3d 1136, 1139 (10th Cir. 2010). After his applications were administratively denied, he requested a hearing before an administrative law judge (ALJ).

At the hearing, Garcia's attorney amended the disability onset date to September 4, 2014, Garcia's fiftieth birthday. He also conceded there was not "a lot of medical information." App. Vol. II at 31. In fact, the only medical records pre-dating the DIB and SSI applications were from two hospital visits in 2011, the first for a spider bite and the second after Garcia was struck by a pry bar, resulting in left wrist pain and numbness in his fifth finger. With the latter visit, imaging showed degenerative arthritis in his left wrist but no fractures or other bony abnormalities, and on exam, Garcia demonstrated a full range of motion in his right arm and wrist.

In February 2016, Garcia saw Conner Fullenwider, M.D., for a consultative examination. He described pain, decreased mobility, and weakness in his back, hands, and shoulders. He stated that his typical pain level was a 5 out of 10 and that he found relief with rest and medication, but he denied currently taking any medication. Dr. Fullenwider observed Garcia was not in "acute distress," App. Vol. III at 312 but "had poor eye contact" and "was tearful," *id.* at 313. He noted Garcia did not use an assistive device to walk but "had a slow unsteady shuffling walk," *id.* at 314. He also had to catch Garcia from falling several times, and Garcia put his hand on the wall to steady himself when leaving the office. Garcia exhibited normal

2

muscle bulk and tone and 5/5 muscle strength in all areas except for 4/5 strength in his right deltoids, right hand grip, and right finger abduction. Dr. Fullenwider noted Garcia had nodules on his right fingers, decreased range of motion in his back and hands, decreased sensation in his hands, and comparatively less strength in his right shoulder. He reported Garcia's straight leg tests as positive on the left side and negative on the right. And he observed Garcia "was able to lift, carry and handle light objects" and "dress and undress adequately" but was unable to rise from a squatting or "sitting position without assistance," "walk on heels and toes," or "stand or hop on either foot bilaterally." *Id.* Ultimately, he opined Garcia would have difficulty performing jobs involving typing or writing and would not be able to perform heavy lifting, manual labor, or jobs requiring long periods of standing.

In March 2016, Garcia underwent a neurological consultative examination by Sherman B. Lawton, M.D., a board-certified neurologist. Dr. Lawton did not have any medical records on Garcia to review. Garcia denied being on any medication and did not appear to describe radicular pain. Dr. Lawton described Garcia as "a muscular man" with "muscular" calves. *Id.* at 319. He noted Garcia walked without an assistive device, and although he had "an unusual way of walking," it "was not shuffling" and seemed "nonorganic." *Id.* He observed some giveaway in Garcia's arms, which was "more marked" in his legs. *Id.* But straight leg raise testing was negative on both sides. Ultimately, Dr. Lawton found "no evidence whatsoever of

3

radiculopathy"[1] given Garcia's intact reflexes and sensation and the absence of atrophy or "organic weakness." *Id.* at 320.

X-rays of Garcia's hand and shoulder taken in July 2016 were unremarkable. On exam in September 2016, he had positive straight leg testing on both sides and tenderness and decreased range of motion in his lumbar spine. But deep tendon reflexes and motor and sensory examinations were normal. X-rays showed degenerative changes but no acute fractures, dislocations, or bony abnormalities.

An MRI taken in December 2016 indicated "[r]otator cuff tendinosis," "[m]oderate glenohumeral joint arthrosis," "complex degeneration and tearing," "[s]evere acromioclavicular joint arthropathy," "[m]oderate subacromial-subdeltoid bursitis," and "[s]mall joint effusion with synovitis." *Id.* at 346. In January 2017, he reported his right shoulder pain as a 5 out of 10 and was informed he would need an arthroscopy "when eligible." *Id.* at 344.

At the hearing in February 2017, Garcia testified that he could be on his feet for 10 to 15 minutes before needing to stop and sit down and that sometimes it was difficult to get up from a seated position. In his written reports to the agency, he noted that pain made it difficult to do things around his home but that he helped care for his wife by making simple meals and driving to the store, doctor appointments, and church. He also reported spending 7 to 10 hours per week on chores, including "pick[ing] up around the house," doing "a little laundry," taking out the trash, and

---

[1] *See Grogan v. Barnhart*, 399 F.3d 1257, 1262 n.2 (10th Cir. 2005) (noting radiculopathy is a pinched nerve or symptoms caused by compromised nerve roots).

4

mowing the lawn. *Id.* at 243. He noted that he went outside several times a day and that he went shopping once or twice a week for about two hours at a time. Garcia reported that he could tend to his personal care, albeit at a slower pace, and did not indicate using a cane or assistive device to walk. Finally, contrary to his statement to Dr. Fullenwider that he had not worked since 2010, Garcia reported to the agency that he had been performing a couple hours of janitorial work each week since 2014.

In his decision, the ALJ applied the five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4);[2] *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (summarizing the steps). At Steps One and Two, he found that Garcia had not engaged in substantial gainful activity since January 1, 2012, and that his impairments were severe. At Step Three, he found Garcia did not have an impairment or combination of impairments that met or equaled any of the listed impairments "conclusively presumed to be disabling," *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007) (internal quotation marks omitted). In particular, he found that Garcia's back impairment did not satisfy Listing 1.04A and that his degenerative joint disease and arthritis did not satisfy Listing 1.02. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.02, 1.04A.

The ALJ next concluded Garcia has the residual functional capacity (RFC) to perform "light work," 20 C.F.R. § 404.1567(b), subject to limitations, such as not reaching overhead or using ladders. Based on that RFC, the ALJ found at Step Four

---

[2] For sake of simplicity, we cite the regulations for DIB claims in 20 C.F.R. Part 404 and omit the substantively identical provisions for SSI claims in Part 416.

that Garcia could not perform his prior job as a building superintendent. But at Step Five he found Garcia could perform other jobs of which there were a significant number in the national economy. Based on testimony from a vocational expert (VE), the ALJ identified three semiskilled occupations performed at the light range of exertion: (1) usher, with 9,000 to 10,000 such jobs in the national economy; (2) guide escort, with 3,000 to 3,500 jobs; and (3) children's attendant, with 8,500 jobs. The ALJ therefore concluded Garcia was not disabled and denied his applications.

The Appeals Council declined to review the ALJ's decision, which therefore became "the Commissioner's final decision," *Madrid v. Barnhart*, 447 F.3d 788, 789-90 (10th Cir. 2006). Garcia then appealed to district court, and a magistrate judge, proceeding with the parties' consent, affirmed. This appeal followed.

## DISCUSSION

Garcia contends the ALJ erred by: (1) not fully developing the record; (2) giving only partial weight to Dr. Fullenwider's opinion; (3) failing to consider his subjective complaints; and (4) finding he was capable of performing other jobs that existed in a significant number in the national economy.

### I.     Standard of Review

"[W]e review the ALJ's decision only to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It

6

requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084 (internal quotation marks omitted). Although "[w]e consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, . . . we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Id.* (internal quotation marks omitted). This court therefore "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (alteration and internal quotation marks omitted).

In addition, as long as "we can follow the [ALJ's] reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). Also, "[t]he ALJ is not required to discuss every piece of evidence." *Wall v. Astrue*, 561 F.3d 1048, 1067 (10th Cir. 2009) (internal quotation marks omitted). "[W]e will generally find the ALJ's decision adequate if it discusses the uncontroverted evidence the ALJ chooses not to rely upon and any significantly probative evidence the ALJ decides to reject." *Id.* (internal quotation marks omitted).

## II.     Failure to Develop the Record

In his opening brief, Garcia argued that Dr. Fullenwider's findings "precisely match the criteria to meet Listing 1.04A" and that his "impairment was severe enough to meet Listing 1.04 just over one month after the date he was last insured." Aplt. Opening Br. at 10-11. In his reply brief, he explained he was not contesting the

7

ALJ's rejection of Listing 1.04A but was instead arguing that Dr. Fullenwider's findings created an ambiguity concerning the onset date of his disability. This ambiguity, he argues, required the ALJ to develop the record by consulting a medical advisor to determine the onset date. *See* SSR 83-20, 1983 WL 31249, at *4 (Jan. 1, 1983).[3] We disagree.

Among other things, SSR 83-20: (1) defines the onset date as "the first day an individual is disabled as defined in the [Social Security] Act and the regulations," *id.* at *1; and (2) explains the ALJ "should call on the services of a medical advisor when onset must be inferred," *id.* at *3. Because "an ALJ has a duty to develop a full and fair record," we have interpreted SSR 83-20 as requiring the ALJ to "consult a medical advisor when evidence of onset is ambiguous." *Blea v. Barnhart*, 466 F.3d 903, 911 (10th Cir. 2006) (brackets and internal quotation marks omitted). However, the need to determine an onset date is relevant only when a claimant has been found disabled. *See id.* at 908-10 (applying SSR 83-20 where the claimant was found disabled but the onset date was unclear). Because the ALJ found Garcia was not disabled, there was no need to consult a medical advisor to determine an onset date. The ALJ did not err in failing to consult a medical advisor under SSR 83-20.

---

[3] SSR 83-20 was rescinded after Garcia's hearing. *See* SSR 18-01p, 2018 WL 4945639, at *1 (Oct. 2, 2018) (clarifying an ALJ "may, but is not required to," obtain a medical expert's assistance with inferring an onset date).

### III.  Weight Assigned to Dr. Fullenwider's Opinion

Garcia next contends the ALJ erred in giving Dr. Fullenwider's opinion only partial weight for being "inconsistent" with both Dr. Lawton's opinion and Garcia's reported daily activities.  App. Vol. II at 20.  Garcia's arguments are unavailing.

An ALJ is guided by several factors when assessing a medical opinion, including: (1) "giv[ing] more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a [non-examining] medical source," 20 C.F.R. § 404.1527(c)(1); (2) giving more weight to a medical opinion the more consistent it is with the record, *id.* § 404.1527(c)(4); and (3) "giv[ing] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist," *id.* § 404.1527(c)(5).

Garcia first contends "Dr. Fullenwider's opinion cannot be inconsistent with Dr. Lawton's because Dr. Lawton did not give an opinion about Garcia's ability to function."  Aplt. Opening Br. at 13.  But although Dr. Lawton's opinion may not have contained "specific findings regarding [Garcia's] functional ability," it clearly "conflicts with Dr. Fullenwider's opinion regarding [Garcia's] limitations."  App. Vol. I at 56.  For example, Dr. Fullenwider described Garcia's walk as "shuffling," App. Vol. III at 314, but Dr. Lawton said it "certainly was not shuffling" and his unusual gait appeared "nonorganic," *id.* at 319.  Dr. Fullenwider noted Garcia had decreased sensation in his hands, but Dr. Lawton found no sensory loss.  Dr. Lawton also did not note any balance issues such as those reported by Dr. Fullenwider.  And

9

the two doctors recorded different results with straight leg tests. Garcia cites areas of agreement, but the doctors' findings did conflict.

Nevertheless, Garcia asserts "Dr. Lawton's report does not contain any findings relating to Garcia's hands" and, therefore, cannot support rejecting the limitations Dr. Fullenwider noted regarding "Garcia's ability to type, write, and grasp." Aplt. Opening Br. at 14. But the RFC makes no reference to typing or writing, and there is no indication the jobs identified by the VE required typing or writing. Moreover, Garcia's counsel questioned the VE regarding the extent of handling required by these jobs but did not ask any questions about typing or writing. As for grasping, Dr. Fullenwider did not include this among Garcia's "[p]ossible [l]imitations." App. Vol. III at 314. He noted during his examination that Garcia was unable to grasp tools such as a hammer, but he also found Garcia was able to manipulate small objects. His report does not indicate Garcia was incapable of occasionally "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands," SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985) (defining "handling"). *See* App. Vol. II at 49 (testimony from VE indicating the jobs he identified only required occasional handling).

Garcia next challenges the ALJ's finding that Dr. Fullenwider's opinion was inconsistent with Garcia's reported activities. But although Garcia correctly notes he reported spending a lot of time watching TV and resting, that does not mean his activities are largely "sedentary" or incompatible with "light exertional work," Aplt. Reply Br. at 10. To the contrary, his other activities include: (1) preparing meals;

10

(2) driving to the store, doctor appointments, and church; (3) spending 7 to 10 hours per week on chores, including picking up around the house, doing laundry, taking out the trash, and mowing the lawn; (4) going shopping once or twice a week for two hours at a time; (5) going to his mother's house once a week; (6) going out to eat once a week; (7) tending to his personal care, albeit at a slower pace; and (8) performing a couple hours of paid janitorial work each week at his church. These activities stand in stark contrast to Dr. Fullenwider's observations and opinion, and the ALJ's credibility finding in this regard is supported by substantial evidence.

Garcia insists, however, "the ALJ did not articulate what activities of daily living were inconsistent with Dr. Fullenwider's opinion." Aplt. Opening Br. at 13. We have not previously required ALJs to finely parse a claimant's reported activities in this fashion, including activities resembling those in the present case.[4] Certainly, an ALJ's decision that leaves us "to guess what evidence, if any, belies [the] testimony" may be inadequate. *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014). But no guesswork is needed here, and the ALJ was not required to

---

[4] *See, e.g.*, *Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013) (concluding the ALJ "adequately explain[ed] his reasoning" when he noted a physician's assessment of the claimant's "extreme limitations [was] inconsistent with [her] reported activities of daily living," including tending to her personal care, attending church, driving, visiting friends, grocery shopping, cooking, vacuuming, cleaning dishes, reading, and watching television); *Wilson*, 602 F.3d at 1146 (noting the ALJ properly identified the claimant's report of severe back and neck pain as being inconsistent with her activities, including driving, shopping, gardening, visiting friends, and going out to eat, which indicated she had "the ability to care for herself, her home and her children" (internal quotation marks omitted)).

11

engage in a "formalistic factor-by-factor recitation of the evidence," *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

## IV.    Garcia's Symptoms

Next, Garcia contests the finding that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record," App. Vol. II at 17.  He fails to show the finding was erroneous.

Credibility findings "are peculiarly the province of the finder of fact" and should be upheld "when supported by substantial evidence."  *Wilson*, 602 F.3d at 1140 (internal quotation marks omitted).  When determining whether a claimant's subjective complaints of pain are credible, an ALJ should consider:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.* at 1145 (internal quotation marks omitted).  An ALJ need not explicitly address each factor.  *See Qualls*, 206 F.3d at 1372.

Although Garcia does not dispute the ALJ's finding that he "has had minimal care and treatment," App. Vol. II at 20, he contends the ALJ failed to inquire about possible reasons for that minimal treatment, such as the possibility that he lacked the financial means to seek treatment, *see* App. Vol. III at 230 (note in application file dated January 12, 2016, indicating Garcia "state[d] that he ha[d] not seen a Doctor

12

since April 2010 due to lack of funds and medical insurance"). *See* SSR 16-3p, 2016 WL 1119029, at \*8 (Mar. 16, 2016) (noting an ALJ "will not find [a claimant's] symptoms inconsistent with the evidence" due to a lack of treatment "without considering possible reasons" for not seeking treatment); *see also Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (stating before an ALJ may base an adverse credibility determination on a "failure to pursue treatment or take medication," the ALJ "should consider (1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse" (internal quotation marks omitted)).

As an initial matter, we note the ALJ specifically addressed the dearth of medical records at the evidentiary hearing. In response, Garcia's counsel agreed there was not "a lot of medical information" but nonetheless insisted the records were "fairly informative." App. Vol. II at 31. We will not fault the ALJ when Garcia and his counsel had the opportunity to explain the absence of medical records and never directed the ALJ's attention to the note in Garcia's file.[5] *See Wilson*, 602 F.3d at 1149 (noting "the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored" (internal quotation marks omitted)).

---

[5] Moreover, the note itself conflicted with the record. According to the January 2016 note, Garcia stated he had not seen a doctor since April 2010. But the record contained evidence of hospital visits in July and November 2011.

13

In any event, the absence of records was not the only basis for the ALJ's skepticism about Garcia's symptoms. The ALJ also noted Garcia had "extreme walking and balance issues at his consultative examination in February 2016" with Dr. Fullenwider but "not at his examination" a month later with Dr. Lawton. App. Vol. II at 20. And notwithstanding his claim of disabling pain, Garcia did not take any pain medication and did not require the use of an assistive device to walk. Finally, the ALJ observed Garcia's "daily activities . . . are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id.* As noted above, we reject his argument that this finding was not sufficiently specific.

### IV. Significant Number of Jobs in National Economy

Finally, Garcia contends the ALJ erred in finding there was a significant number of jobs in the national economy that he was capable of performing, without first considering the factors listed in *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992).[6] We disagree.

Because Garcia met his burden to show he could not perform his past work, the Commissioner had the burden "at step five to show that [Garcia] retains sufficient RFC to perform work in the national economy, given [his] age, education, and work experience," *Lax*, 489 F.3d at 1084 (alteration and internal quotation marks omitted). Such work must "exist[] in significant numbers either in the region where [he] lives

---

[6] Although Garcia initially suggested the sheer number of jobs identified by the ALJ was not a significant number, he clarified that his argument was "that the ALJ failed to properly consider th[e] [*Trimiar*] factors **before** finding that 20,000 to 22,000 jobs in the national economy was significant," Aplt. Reply Br. at 2.

14

or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). It is immaterial, though, "whether . . . (1) [w]ork exists in the immediate area in which [the claimant] live[s]; (2) [a] specific job vacancy exists for [the claimant]; or (3) [the claimant] would be hired if [he or she] applied for work." 20 C.F.R. § 404.1566(a).

We have declined to "draw[] a bright line establishing the number of jobs necessary to constitute a 'significant number.'" *Trimiar*, 966 F.2d at 1330. Instead, "each case should be evaluated on its individual merits" and an ALJ should consider several factors, including "the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; [and] the types and availability of such work." *Id.* (internal quotation marks omitted).

Garcia contends the ALJ failed consider two *Trimiar* factors—"the distance Garcia would have to travel" and "the isolated nature of the jobs." Aplt. Opening Br. at 8. He argues these "are important factors" because the regulations indicate the Commissioner "'will not deny disability benefits on the basis of the existence of . . . jobs'" "'that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] live[s].'" *Id.* (quoting 20 C.F.R. § 404.1566(b)).

First, to the extent Garcia believes the record is inadequate regarding the location and geographical concentration of the occupations the VE identified, his counsel could have asked additional questions at the hearing to clarify such issues. *See Gay v. Sullivan*, 986 F.2d 1336, 1340 n.2 (10th Cir. 1993) ("Counsel could have probed the witness about the source's reliability and acceptance in the profession, but

15

he did not do so, and now our assessment of such matters is effectively foreclosed." (citing *Trimiar*, 966 F.2d at 1330-31 & n.13)). *See generally Wall*, 561 F.3d at 1063 (noting that "the ALJ may reasonably rely on counsel to identify the issue or issues requiring further development" and that the claimant must raise any substantial issue he seeks to develop (internal quotation marks omitted)).

In any event, we have noted that "[i]n *Trimiar* the focus was on jobs in the regional economy because the vocational expert in that case testified *only* to the number of available jobs in the *regional* economy." *Raymond v. Astrue*, 621 F.3d 1269, 1274 n.2 (10th Cir. 2009). The court therefore "turned to the multi-factor analysis to help" in determining whether a mere "650 to 900 [regional] jobs [was] a 'significant number.'" *Id.* But the ALJ in Garcia's case made a finding only as to national jobs, consistent with our observation that "the proper focus generally must be on jobs in the national, not regional, economy." *Id.* at 1274.

Moreover, "*Trimiar* does *not* hold . . . that a court must engage in a factoral analysis when the number of jobs relevant available is . . . much larger" than the number of jobs at issue in *Trimiar*. *Id.* at 1274 n.2. Certainly, this case presents far fewer national jobs than the 1.3 million jobs in *Raymond*. *See id.* But the number of national jobs in the present case also far exceeds the 650 to 900 regional jobs identified in *Trimiar*.[7] And Garcia has not established that 20,500 to 22,000 jobs is a "very limited number[]" under 20 C.F.R. § 404.1566(b).

---

[7] Garcia contends that "[t]he easiest way to get a national perspective is to multipl[y] the numbers in *Trimiar* by the [49] continental states" and that "[d]oing so

16

Finally, "[o]verriding the bare numbers is the procedural fact that th[is] case[] involve[s] court review of a *finding* of numerical significance *made by the ALJ*" and not a determination "in the first instance that a particular number [is] significant under the circumstances," *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004). "[N]umerical significance entails many fact-specific considerations requiring individualized evaluation" and "should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.* (internal quotation marks omitted); *see also Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999) (noting the factors identified in *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988), which served as the basis for the *Trimiar* factors, "[a]re suggestions only—the ALJ need not explicitly consider each factor"). The ALJ found Garcia could perform jobs that existed in significant numbers in the national economy, and "[w]e do not presume to interpose our judgment for that of the ALJ," *Trimiar*, 966 F.2d at 1332. Accordingly, he has not shown the ALJ erred.

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

shows that the regional jobs in *Trimiar* are equivalent to 31,850 to 44,100 national jobs thereby making the *Trimiar* factors relevant to this case." Aplt. Reply Br. at 4. But he cites no authority for this analysis, and we know of none. The number of jobs in the national economy is based on a VE's testimony, not rote arithmetic.