**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 30, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

LAURIE S. HARPER,

      Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

      Defendant-Appellee.

No. 10-5136
(D.C. No. 4:09-CV-00238-TLW)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **ANDERSON**, and **HOLMES**, Circuit Judges.

---

Laurie S. Harper appeals from an order of the district court affirming the

Commissioner's decision denying her application for Social Security disability

benefits. Harper filed for these benefits on July 22, 2005. She alleged disability

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

based on fibromyalgia and depression. The agency denied her applications initially and on reconsideration.

On March 10, 2008, Harper received a de novo hearing before an administrative law judge (ALJ). The ALJ determined she retained the residual functional capacity (RFC) to perform the full range of sedentary work. He found she could return to her past relevant work as a secretary and, alternatively, there were a significant number of other jobs she could perform in the national or regional economy. Applying the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, Subpt. P, App. 2, rule 201.28 (the grids) the ALJ concluded Harper was not disabled within the meaning of the Social Security Act. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing process). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 n.2. If the claimant successfully meets this burden, the burden of proof

shifts to the Commissioner at step five to show the claimant retains a sufficient RFC to perform work in the national economy, given her age, education and work experience. *See id.* at 751.

Harper raises several issues for our review. We conclude one of the issues presented, involving the evaluation of her treating physicians' opinions, requires a remand for further administrative proceedings. Our purpose in discussing the remainder of her issues is only to provide guidance to the ALJ for proceedings on remand.

**1. Treating Physician Analysis**

As the ALJ acknowledged, Harper suffers from fibromyalgia and depression. Her primary treating physician for these conditions was Dr. Kent Farish. According to the medical evidence before the ALJ, Harper saw Dr. Farish a total of 17 times between April 29, 2004 and May 11, 2006 for various ailments, mostly her fibromyalgia and depression. In one of his treatment notes, Dr. Farish opined Harper's "severe myalgia" would prevent her from driving and from "sitting more than 1 hour per day." Aplt. App. at 188. Despite this evidence, the ALJ did not mention Dr. Farish in his decision. Nor did he discuss the limitations Dr. Farish imposed in his opinion about Harper's ability to sit and to drive.

Harper appeared pro se at the ALJ hearing. In a submission to the Appeals Council, counsel, who entered an appearance after the hearing, provided records

of another three visits with Dr. Farish.  Counsel also submitted two medical reports in which Dr. Farish expanded on his opinion of her ability to work.

In the first of these reports, dated April 22, 2005, Dr. Farish diagnosed Harper with "systemic inflammatory disease/myopat[hy]." *Id.* at 271.  He restricted her from lifting over two pounds; from doing overhead work or work at or above the shoulder level; from bending or stooping; from kneeling or squatting; from climbing or work at heights; from "lifting, turning or assisting others"; and from operating a motor vehicle or machinery.  *Id.*  He stated she was "unable to sit at a desk more than one hour a day due to pain in muscles, headache," and restricted her to working less than one hour per day.  *Id.*  He limited Harper to one hour a day of sedentary activity, and zero hours per day of light, medium, or heavy activity, explaining she was "disabled due to a myopathy that is yet undiagnosed.  She has been referred to a rheumatologist and will be disabled [a] minimum [of] 60 days."  *Id.* at 272.

In the second report dated June 16, 2006, submitted in connection with a private disability application, Dr. Farish diagnosed Harper with myopathy, established subjectively by muscle pain and objectively by "elevated CPK," which is apparently a muscle enzyme associated with myopathy.  *Id.* at 269.  He stated she could sit or stand for one hour continuously, but could walk for zero hours per workday.  *Id.* at 270.  She should never climb, twist, bend, stoop, reach above the shoulder level, or operate heavy machinery.  *Id.*  She could do no lifting

-4-

or pushing/pulling, but could occasionally employ fine finger movements and hand-eye coordinated movements. *Id.* It was "unknown" when her condition might improve. *Id.*

The Appeals Council made these records part of the administrative record. *See id.* at 37. They therefore became "a part of our record on judicial review." *Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011). The Appeals Council, however, did not conduct any treating physician analysis in its decision denying Harper's request for review; it merely stated the new evidence, including the opinions of Dr. Farish, "does not provide a basis for changing the [ALJ's] decision." Aplt. App. at 34.

In order to properly evaluate the opinion of a treating physician, an ALJ (and the Appeals Council when the issue is before it) must engage in the following analysis:

First, he "must give good reasons in the notice of determination or decision for the weight assigned to a treating physician's opinion. Further, the notice of determination or decision must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quotations, citations, and alteration omitted).

In determining how much weight to give a treating source's opinion, an ALJ must first decide whether the opinion qualifies for "controlling weight." *Id.*

To make this decision, the ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2 (quotation marks omitted). If the answer to this question is no, then the controlling-weight analysis is complete. *Watkins*, 350 F.3d at 1300. On the other hand, "[i]f the ALJ finds that the [doctor's] opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record." *Id.*

Finally, even if the ALJ finds the opinion is not entitled to controlling weight, he must still afford it deference and weigh it according to the factors provided in 20 C.F.R. §§ 404.1527.[1] SSR 96-2p, 1996 WL 374188, at *4. These factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

---

[1] The ALJ stated he had "considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." Aplt. App. at 49. This conclusory statement did not satisfy his responsibility to give reasons for the weight he assigned to Dr. Farish's opinions.

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quotation omitted). After considering these factors, the ALJ must give good reasons for the weight he ultimately assigns the opinion in his notice of determination or decision. If the ALJ rejects the opinion completely, he must give specific, legitimate reasons for doing so. *Watkins*, 350 F.3d at 1301.

Neither the ALJ nor the Appeals Council evaluated Dr. Farish's opinions using the foregoing analysis. This failure requires a remand for further proceedings, since Dr. Farish imposed significant restrictions on Harper's ability to work that were never discussed by either the ALJ or the Appeals Council. We therefore remand for further evaluation of Dr. Farish's medical opinions and their effect on the determination of disability in light of all the evidence of record.

**2. Development of the Record**

Harper contends the ALJ failed to develop an adequate record for her as an unrepresented person by neglecting to (a) advise her adequately of her right to counsel and document her consent to proceed pro se; (b) question her husband, who appeared at her hearing as a witness; (c) develop her testimony concerning the effect of her impairments; and (d) develop the record concerning her treatment for fibromyalgia after August 2006. Having examined these claims in light of the record and the applicable law, we discern no reversible error in the alleged insufficient development of the record. We note—with the exception of one medical record it permissibly rejected as dealing with matters outside the relevant

-7-

time period--the Appeals Council accepted and made a part of the record all medical records submitted by Harper's counsel.  These medical records are now available to the ALJ and he should properly consider and evaluate them as part of the proceedings we have ordered on remand.

### 3.  Dr. Jacobs' Opinion Concerning "Stress"

During the hearing, the ALJ asked Harper whether there were any errors in the agency file.  She noted in one of his records, her rheumatologist Dr. Jacobs characterized her as "a normal, white, 41-year-old female."  Aplt. App. at 288.[2] Harper, however, is African-American.  She stated she "wasn't sure if he was getting me mixed up with someone else."  *Id.*

The ALJ then asked "[s]o you think maybe [Dr. Jacobs] got the report wrong?"  *Id.*  In response, Harper suggested Dr. Jacobs was wrong about more than just her race.  She noted "Dr. [Farish] said he was going to talk to Dr. Jacobs because Dr. Jacobs said that he didn't think that there was anything significant, but my muscle enzyme level keeps going up and there is evidence that I do [have] fibromyalgia challenges."  *Id.* at 288-89.  She added "Dr. Jacobs was saying that *he thought I was just under a lot of stress*.  So . . . I'm just not sure if . . . he's thinking of [me or some other, white female]."  *Id.* at 289 (emphasis added).

---

[2]    This is actually a slight misquotation of Dr. Jacobs' notes; he said she was a "*Healthy appearing* 41-year old white female."  Aplt. App. at 150 (emphasis added).

In his decision, the ALJ relied on Harper's statement about Dr. Jacobs' opinion of her condition. He stated "[o]ne of her physicians, a Dr. Jacobs, does not believe she has anything beyond the effects of stress." *Id.* at 51.[3] Harper argues since this "opinion" about stress from Dr. Jacobs does not appear anywhere in the medical record itself, the ALJ could not rely upon it.

Harper cites no authority stating an ALJ may not rely on what a claimant tells him about her doctor's opinion of her condition. The real issue is whether Dr. Jacobs' opinion as reported by Harper at the hearing was so unreliable (for example, because it was unsupported by medical evidence or inconsistent with the other evidence of record, *see* SSR 96-2p, 1996 WL 374188, at *4), the ALJ was precluded from relying on it in his decision. We cannot say as a matter of law the ALJ was required to give the opinion no weight. It finds some support in Dr. Jacobs' written records. *See, e.g.,* Aplt. App. at 139 (treatment note from Dr. Jacobs' stating "we do not feel [Harper] has a serious muscle disease"). But the ALJ did not include an analysis of the opinion in his decision. If on remand the ALJ again relies on Dr. Jacobs' opinion, he should properly analyze the opinion and provide specific reasons for the weight he assigns to it.

---

[3] The ALJ evidently accepted Harper's statement about what Dr. Jacobs said about her condition, but rejected her suggestion it resulted from confusing her with some other, Caucasian patient. Harper fails to show this conclusion about what Dr. Jacobs said, *and why he said it*, lacked supporting substantial evidence.

## 4. Adequate Analysis of Pain

Harper contends the ALJ failed to conduct an adequate analysis of her allegations of disabling pain. *See Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987) (setting out analysis to be followed when evaluating pain). The ALJ's decision included the following analysis:

> As for the claimant's fibromyalgia, there are no records of treatment following August 2006. One of her physicians, a Dr. Jacobs, does not believe she has anything beyond the effects of stress. Ms. Harper acknowledged that her medications relieve her physical discomfort although she does have side effects. She wrote of fatigue, dizziness, drowsiness, and "brain fog." But there are no medical documents substantiating the side effects. Nor is there any evidence that the side effects are inevitable and uncorrectable by changes of her medication or readjustment in the dosages of her present medications. Ms. Harper is able to work part-time for her church although this work is done at her discretion.

Aplt. App. at 51.

Harper does not explain why this analysis does not meet the requirements of *Luna*. *See* Aplt. Br. at 19-21.[4] She goes on to make a separate argument that the ALJ failed to cite record support for his finding her allegations concerning the nature of her pain were "not credible." *See id.* at 21-22. This argument fails

---

[4] In her reply brief, Harper again contends the ALJ's pain analysis was deficient, because it neither cited *Luna* nor expressly conducted the three-part analysis prescribed in *Luna*. But this is simply wrong. The ALJ discussed all three requirements in the *Luna* analysis: whether a pain-producing impairment existed; whether there was a loose nexus between the impairment and her allegations of pain; and whether her pain was in fact disabling. *See* Aplt. App. at 50-51.

because as can be seen from the paragraph cited above, the ALJ's discussion of Harper's pain allegations relied on the *lack* of evidence, not contrary medical evidence. Harper fails to substantiate her claim the ALJ's analysis was so deficient it is per se reversible error.

Also, Harper appears to misunderstand the nature of the ALJ's credibility inquiry. She complains the ALJ failed to cite any medical evidence showing "deceptiveness, equivocation, prevarication, trumpery or guile" that would establish a reason for rejecting her testimony. *Id.* at 22. The ALJ's ability to make credibility findings is not limited to citing evidence the claimant is lying. Rather, he is to examine objective factors such as "a claimant's persistent attempts to find relief for his pain and his willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor, . . . the possibility that psychological disorders combine with physical problems[,] . . . the claimant's daily activities," and side effects of medication. *Luna*, 834 F.2d at 165-66. In his analysis quoted above, the ALJ discussed at least some of these factors, and used them to evaluate Harper's credibility. She fails to make specific argument concerning the adequacy of his discussion of these factors. Thus, she fails to show the ALJ's discussion of pain requires reversal.

### 5. "Sheltered" Work at Church

The ALJ determined Harper could return to her "past relevant work" as a secretary. *See* Aplt. App. at 51. But her only work as a secretary is for her

-11-

church and she only works there ten to twelve hours per week; this is not "substantial gainful activity," as the ALJ implicitly determined. *See id.* at 48 ("The claimant has not engaged in substantial gainful activity since . . . the alleged onset date."). For this reason, as the Commissioner acknowledges, it also cannot serve as "past relevant work." *See* Aplee. Br. at 36.

The alleged error is harmless, however. In addition to making a finding at step four that Harper could return to her past relevant work, the ALJ also found at step five she could do other jobs in the national economy. The ALJ's error at step four did not taint his step five finding because the step five finding did not rely on a misstatement about her past relevant work.

Harper has another, similar argument to make, however, that does implicate the step-five finding. She contends the ALJ improperly determined "'if she can work for her church, she's not disabled for other work.'" Aplt. Opening Br. at 24 (quoting ALJ). In other words, the ALJ should not have relied at all on her part-time, sheltered work at the church, which was irrelevant to the determination of the credibility of her assertions of disabling pain.

This issue lacks merit. Harper fails to show her active participation in part-time work was not a relevant factor the ALJ could consider in assessing her credibility. Also, contrary to her assertion the ALJ should have considered the fact her church work was "limited in time," "limited in scope and demand," and conducted in "a sheltered environment," *id.* at 25, the ALJ did give some

-12-

consideration to such factors, noting the "work is done at her discretion," Aplt. App. at 51.

### 6. Assessment of Mental Limitations

Harper contends the ALJ failed to consider her ability to interact appropriately with the public, her supervisors, and co-workers, citing *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994) (discussing evaluation of mental RFC). The ALJ found "[i]n social functioning, the claimant has mild difficulties." Aplt. App. at 49. This finding was supported by substantial evidence in the record. *See id.* at 167 (PRT form completed by Janice B. Smith, Ph.D.). Harper's cursory argument fails to overcome this substantial evidence.

Harper also argues the ALJ failed to make findings concerning the mental demands of her past relevant work. While this appears to be true, any error here is harmless because of the ALJ's alternative findings at step five concerning other jobs Harper can do. We note, however, for this reason and others we have identified, the ALJ cannot rely on his existing past relevant work analysis and will have to reformulate it if, on remand, he again denies benefits at step four.

Finally, Harper complains the ALJ relied on a consultant's statement "with counseling and appropriate psychotrophic medication there was a good chance for improvement." *Id.* at 50. She contends this is inappropriate because it does not discuss her *current* condition and its effect on her ability to work, but rather focuses on hypothetical improvement that has not yet occurred. If this were all

the ALJ said about her mental RFC, Harper might have a point. But the ALJ said more.

The ALJ made lengthy findings concerning the severity of Harper's mental impairment. *See id.* at 49-51. Although Harper contends the ALJ's analysis amounted to "little more than cursory attention to Ms. Harper's depression symptoms and how they contribute to her disability," Aplt. Opening Br. at 28, she fails to flesh out any specific deficiencies in the analysis, other than the alleged focus on prospective improvement in her condition. Absent a better-developed argument on this point, we cannot conclude the ALJ's analysis was deficient.

### 7. Alleged Racial and Religious Bigotry

Harper complains the ALJ's statements at the hearing reflected racial and religious bigotry and bias against her. She also asserts the district court exhibited racial and religious bias in its decision.[5] Although Harper's claims of bias or bigotry by the district court are, strictly speaking, irrelevant to her appeal,[6] we believe it is important to discuss her accusations involving the district court as well as those involving the ALJ in order to highlight the unfounded nature of her allegations.

We begin with Harper's accusations of bigotry and bias by the ALJ. She

---

[5] The district court's decision was issued by a magistrate judge, by consent of the parties. *See* 28 U.S.C. § 636(c)(1), (3).

[6] We review the Commissioner's decision for substantial evidence and legal accuracy, rather than the district court's.

-14-

complains that the following exchange shows that the ALJ's decision against her was prompted by religious bias:

Q. You . . . went to the doctor and he prayed with you?

A. He did.

Q. Yeah.

A. He, he prays with me almost every time I go in there.

Q. Does he play, does he pray with everybody, do you know?

A. I don't know.  I don't know.

Q. Does he belong to your church?

A. No.

*Id.* at 302.

It requires a stretch to conclude from this inquiry, as Harper does, that the ALJ "held her religious beliefs and those of Dr. Farish in contempt" and this contempt infected his decision.  Aplt. Opening Br. at 33.  Dr. Farish specifically prescribed prayer as part of his treatment regimen, so the ALJ's inquiry on this point was related to the medical record.  *See* Aplt. App. at 182.  Harper points to no contemptuous or adverse reference to prayer in the ALJ's decision.  Finally, the ALJ was arguably within his province in seeking to determine more about Dr. Farish's religious connection with Harper and whether that connection could have resulted in bias or lack of objectivity.  We discern no evidence of impermissible religious bias in this exchange.

-15-

Harper also speculates about the ALJ's contempt for her and her husband from the following dialogue:

HA:   Her husband's supposed to testify too.

ALJ:  Oh, he is?

HA:   Yeah.  I didn't want you to --

ALJ:  Okay.  All right.  Why don't you . . . call your husband . . . [I]f he wants to testify, it's up to him.

CLMT:  Oh, he's outside.

ALJ:  Well, does he want to testify?

CLMT:  Yes.

ALJ:  Okay.  You can go out and get him.

CLMT:  Go get him?

ALJ:  You can almost predict -- are we off?

(At this point the hearing went off the record.)

(On the record.)

*Id.* at 297-98.

Harper contends the ALJ went off the record because he caught himself before making an admission about his bias on the record.  She argues that the ALJ was on the verge of making a remark that would have revealed his conviction that he could "almost predict" not only what Harper's husband would say, but also that Harper and her husband were not credible because of their religious beliefs or

-16-

race. *See* Aplt. Opening Br. at 34. Harper's argument, however, is based on speculation. This court cannot determine what, if anything, the ALJ said after Harper left the room, because any such statement was off the record. Absent more, we have no grounds to suppose that the ALJ turned off the microphones because he had something negative to say about Harper or her husband motivated by religion or race. This claim of bias is thus unfounded.

As noted, Harper also complains about the district court's decision. She notes "at the very outset of the District Court's Opinion it states: 'Plaintiff is an African American female.'" Aplt. Opening Br. at 32 (quoting District Court Opinion at 3). She asks "[w]hat possible relevance could Ms. Harper's race have in this legal analysis?" *Id.* The answer to this question is simple. As the district court explained two pages later in its decision, Harper "objected [during the hearing] to a statement in an examination record issued by Dr. Jacobs identifying her as a 'white female.'" Aplt. App. at 16. The reader of the district court's opinion would best understand the nature of this alleged misidentification only if he or she had been previously made aware that Harper is in fact African-American. Thus, this fact was relevant to the background of the district court's analysis, and not superfluous as Harper asserts.[7]

_____

[7] In her reply brief, Harper notes the statement of Harper's race was made at the very beginning of the district court's decision, whereas the controversy about possible confusion with a Caucasian patient was not mentioned until two pages

(continued...)

Harper also complains of religious bias by the district court, reflected in its statement that she "was working 10 to 12 hours per week as a secretary for Liberty World Outreach Church." Aplt. Opening Br. at 31 (quoting District Court Opinion at 3). She asks why it was necessary to identify Harper's church by name, or her husband, "Israel Harper," by his first name, unless both identifications were intended as a subtle attack on Harper's religious affiliation or beliefs. A review of the district court's decision shows that other significant figures in the case, including physicians, were also identified by their first and last names. In addition, other entities besides her church such as her former employer Stairmaster/Nautilus, were identified specifically rather than generically. Moreover, Harper's ongoing work for the church was significant to the case for reasons we have already discussed.

Finally, Harper complains that the district court mentioned the fact that Dr. Farish prayed with her at appointments. We note that Dr. Farish not only prayed with Harper at appointments, he prescribed prayer for her as part of his treatment. We see no reason the district court was obliged to avoid mentioning this facet of Dr. Farish's treatment relationship with Harper. In any event, the

---

[7](...continued)
later. But the mention of Harper's race was immediately followed in the decision by other vital statistics such as her date of birth, age at the time of the hearing, background, marital status, and employment history. We find nothing suggestive of bias in the way the district court organized the factual section of its decision.

district court did not rely on the fact that Dr. Farish employs prayer as part of his treatment regimen in reaching its conclusions, but gave other reasons why the Commissioner might have rejected his opinions concerning her ability to work.

## 8. Conclusion

The judgment of the district court is REVERSED and the case is REMANDED to the district court with instructions to REMAND to the Commissioner for further proceedings in accordance with this order and judgment.

Entered for the Court


Terrence L. O'Brien
Circuit Judge