FILED
United States Court of Appeals
Tenth Circuit

July 1, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MELISSA J. QUALLS,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

Defendant-Appellee.

No. 10-6288
(D.C. No. 5:09-CV-00922-M)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **ANDERSON**, and **HOLMES**, Circuit Judges.

---

Melissa J. Qualls appeals from a district court order affirming the

Commissioner's decision to deny her application for social security disability

insurance benefits (DIB). Ms. Qualls alleged a disability onset date of March 22,

2004. Her date last insured was December 31, 2008; "thus she had the burden of

proving that she was totally disabled on that date or before," *Wilson v. Astrue*,

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

602 F.3d 1136, 1139 (10th Cir. 2010). Our jurisdiction arises under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g). Because the Commissioner's decision is supported by substantial evidence and the law was properly applied, we affirm.

**I.**

Ms. Qualls was 28 years old on her date last insured (DLI). She is a high school graduate and attended one year of college. She has worked as a customer service representative, as a cashier/sales clerk/stocker, and as a childcare provider assistant.

In 2001, Ms. Qualls was diagnosed with Multiple Sclerosis (MS). In 2006, she applied for DIB, alleging an inability to work since March 22, 2004, due to MS, severe migraines, and depression. The agency denied her application initially and on reconsideration.

Following a 2008 hearing before an Administrative Law Judge (ALJ), at which Ms. Qualls and a Vocational Expert (VE) testified, the ALJ denied benefits at steps four and five of the five-step sequential evaluation process for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing five-step process); *see also Murrell v. Shalala*, 43 F.3d 1388, 1389 (10th Cir. 1994) (recognizing benefit of alternative determinations in the social security review process). The ALJ found that between Ms. Qualls' alleged onset date and her DLI: (1) she had not engaged in substantial gainful activity; (2) she was severely impaired by MS and

migraines;[1] (3) she did not have an impairment or combination of impairments that met or medically equaled any of the per se disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) she retained the residual functional capacity (RFC) to perform the full range of light work and was not disabled because—having compared her RFC with the physical and mental demands of her past relevant work (PRW) as a customer service representative and as a cashier/sales clerk/stocker—she could perform her PRW as it is generally performed; and (5) in the alternative, taking into account the testimony of the VE, as well as Ms. Qualls' age, education, work experience, and RFC, she was not disabled because she could make a successful adjustment to other light and sedentary work that exists in significant numbers in the national economy.

The Appeals Council denied Ms. Qualls' request for review, making the ALJ's decision the Commissioner's final decision for purposes of review. *See Wilson*, 602 F.3d at 1140. The district court affirmed the ALJ's denial of benefits, and Ms. Qualls appeals. She contends the ALJ (1) erred at steps four and five of the sequential evaluation process, and (2) failed to perform a proper credibility determination.

---

[1] The ALJ found Ms. Qualls' "medically determinable mental impairment of depression did not cause more than minimal limitation in [her] ability to perform basic mental work activities and was therefore non-severe." Aplt. App., Vol. 2 at 14.

## II.

"[W]e review the ALJ's decision only to determine whether the correct legal standards were applied and whether the factual findings are supported by substantial evidence in the record." *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance. We consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's.

*Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008) (internal quotation marks omitted).

Because "the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC," which is used at steps four and five, "the ALJ's credibility and RFC determinations are inherently intertwined." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009); *see also* Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (July 2, 1996) ("The . . . [claimant's] RFC is used at step 4 of the sequential evaluation process to determine whether an individual is able to do past relevant work, and at step 5 to determine whether an individual is able to do other work, considering . . . her age, education, and work experience."). With this in mind, we turn first to Ms. Qualls' arguments about the ALJ's credibility determination.

### *The ALJ's Credibility Determination*

When a claimant establishes a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms complained of, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of the symptoms to determine the extent to which the symptoms affect the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). To do this, the ALJ must "make a finding about the credibility of the [claimant's] statements about [her] symptom(s) and [their] functional effects." SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Factors the ALJ may consider in assessing a claimant's complaints include "the levels of [her] medication and [its] effectiveness, . . . the frequency of [her] medical contacts, the nature of [her] daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). *See also* 20 C.F.R. § 404.1529(c)(3) (listing seven factors relevant to claimant's symptoms that the ALJ will consider); SSR 96-7p, 1996 WL 374186, at *3 (same).

In this case, the ALJ found Ms. Qualls' medically determinable impairments could reasonably be expected to cause her alleged symptoms.[2] But

---

[2]    Ms. Qualls' symptoms "include[d] migraines triggered by stress/anxiety
(continued...)

he found her "statements concerning the intensity, persistence and limiting effects of [her] symptoms . . . not credible to the extent they [we]re inconsistent with" performing a full range of light work (her RFC). Aplt. App., Vol. 2 at 16.

Ms. Qualls first attacks the ALJ's credibility determination on the grounds that he imposed an incorrect standard of proof that consisted of boilerplate language. Specifically, she challenges the ALJ's statement that her "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty" and that "even if [her] daily activities were truly as limited as she alleged, it is difficult to attribute that degree of limitation to [her] medical condition as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." *Id.* at 18.[3]

---

[2](...continued)
which come[] and go[]; double vision; balance [problems]; problems with numbness in [her] hands, arms, and legs; and her biggest problem is that she can not retain information and has to write things down all the time." Aplt. App., Vol. 2 at 16 (ALJ's recitation of some of Ms. Qualls' hearing testimony).

[3]     The ALJ cited no authority for his requirement that Ms. Qualls' stated activities of daily living "be objectively verified with any reasonable degree of certainty." Aplt. App., Vol. 2 at 18. Indeed, 20 C.F.R. § 404.1529(c)(3)(i) does not require verification. The regulations simply state that such evidence will be evaluated "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). In *Wall v. Astrue*, 561 F.3d 1048 (10th Cir. 2009), we observed that the ALJ had made a very similar "objectively verified" statement. *Id.* at 1070. But the ALJ did so *after* "and thus in light of, his adverse determination of Claimant's credibility." *Id.* at 1069. We determined in *Wall* that the objectionable statement was merely the ALJ's "observation that [he] would not treat Claimant's testimony as 'strong evidence' of her disability due to his *prior* determination that Claimant's testimony was not 'fully credible.'"
(continued...)

As we have often emphasized, boilerplate language, "in the absence of a more thorough analysis," is insufficient to support an ALJ's credibility determination. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). Instead, "findings as to credibility should be closely and affirmatively linked to substantial evidence." *Kepler*, 68 F.3d at 391 (internal quotation marks and brackets omitted). To be sure, an ALJ is required to do more than "simply recite[] the general factors he considered . . . . [without] refer[ring] to any specific evidence." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). But "our opinion in *Kepler* does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relie[d] on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Id.*

The ALJ began his credibility assessment by citing the applicable Social Security regulations and rulings governing the evaluation of symptoms. He observed that Ms. Qualls "testified . . . that she is unable to work due to her inability to retain information." Aplt. App., Vol. 2 at 16. He then listed her reported symptoms, *see supra* note 2, and detailed her subjective complaints,

---

[3](...continued)
*Id.* at 1070 (emphasis added). As such, we rejected the claimant's assertion in *Wall* "that the ALJ evaluated Claimant's credibility under an improper [objectively-verified] standard." *Id.* at 1069. The same is true in this case, as is demonstrated in our discussion of the ALJ's credibility analysis below, and we therefore reject Ms. Qualls' argument that the ALJ imposed an incorrect standard of proof in evaluating her credibility.

*see* Aplt. App., Vol. 2 at 16.  In doing so, he recounted Ms. Qualls' testimony that she "can do the majority of housework except that she does not vacuum often[,]" "[h]er step-daughter plays softball and she goes to the games except when it's hot[,]" "[s]he is able to care for her personal hygiene except when her hand[s] and arms are numb," she "drive[s] and shop[s] with her husband[,]" and "does scrap-booking (when she can); sewing (using the same pattern); and girl scouting (20 girls that she basically baby sits)." *Id.*[4]  It was at this point that the ALJ found Ms. Qualls' "statements concerning the intensity, persistence and limiting effects of [her] symptoms . . . not credible to the extent they [we]re inconsistent with" performing a full range of light work.  Aplt. App., Vol. 2 at 16.  The ALJ's credibility assessment did not end there though.

---

[4]     Earlier in his decision, when the ALJ was considering Ms. Qualls' depression, he recited her reported daily activities (taken from the Function Report Ms. Qualls completed and submitted to the Social Security Administration):

> she gets up; gets dressed; wakes her daughters; and gets them dressed for school.  Claimant prepares breakfast, feeds the children and [her]self.  She takes her daughter to school and then comes home to work on cleaning the house.  [She] [p]repares her youngest daughter lunch and then puts her down for a nap.  Claimant will usually also take a nap.  After nap [she] goes to pick up [her] other daughter from school.  [Then she prepares] dinner; cleans up [the] kitchen; then get[s] the children ready for bed.  Claimant then goes to bed to sleep.  Claimant list[s] houshold chores of cleaning, laundry, and ironing.

Aplt. App., Vol. 2 at 14 (citing *id.* at 140, 147).

The ALJ next turned to the medical evidence, which he chronicled. He noted that Ms. Qualls' treating neurologist, who diagnosed her with MS in 2001, only saw her once in 2006, twice in 2007, and three times in 2008, and that the treating neurologist's "progress notes reflect MS as stable" throughout. *Id.* at 17.[5] The ALJ also described a consulting physician's documentation of Ms. Qualls' subjective complaints and the physician's examination findings, including his determination that Ms. Qualls':

> bone[s] and joints revealed the cervical, thoracic and lumbar spines are perfectly supple and can be put through a full range-of-movement. There is no scoliosis, tenderness or muscle spasm. The upper extremities are unremarkable. The thumb effectively opposes to the finger tips. Fine movement is well-preserved and she can manipulate small objects. Grip strength is rated 5/5 bilaterally. The lower extremities are unremarkable. She can heel-walk, toe-walk and adduct the lower extremities. Gait is perfectly safe, stable and of normal speed and she requires no assistive device.

Aplt. App., Vol. 2 at 17-18; *see also id.* at 18 (according consulting physician's opinion "controlling weight"). The ALJ also described Ms. Qualls' two visits to the Eye Clinic in Ponca City, noting double vision that comes and goes (but is increased when she is tired), and that glasses help to decrease her double vision.[6]

---

[5] We count three office visits in 2006, but this minor difference is immaterial. *See* Aplt. App., Vol. 2 at 195, 196.

[6] The ALJ's decision did not mention esophoria, "[a] tendency for the eyes to turn inward," *Stedmans Medical Dictionary* 138540 (27th ed. 2000), which is documented in one of Ms. Qualls' two visits to the Eye Clinic in Ponca City, Aplt. App., Vol. 2 at 242. Additionally, Ms. Qualls complains that the ALJ's

(continued...)

Next, the ALJ identified Ms. Qualls' daily medications (Copaxone for MS, Wellbutrin for depression, and Nasonex for allergies), and medications she takes on an as-needed basis (Midrin for tension and migraines and Relpax for migraines). He also observed that Ms. Qualls testified that her treating neurologist advised her "she would just have to learn to deal with the migraines," and that Ms. Qualls "appears to have the depression stabilized with the medication." Aplt. App., Vol. 2 at 18. Having discussed all of the foregoing, the ALJ *then* made the statement Ms. Qualls finds objectionable, that her "allegedly

---

[6](...continued)
decision did not mention her "abnormal toe signs, . . . asymmetrical deep tendon reflexes, . . . positive Lhermitte's sign," or her alleged need for "a cane for ambulation." Aplt. Opening Br. at 27-28 (citing Aplt. App., Vol. 2 at 205, 207); Aplt. Opening Br. at 34. Lhermitte sign, "sudden electric-like shocks extending down the spine on flexing the head," *Stedmans Medical Dictionary* 373770 (27th ed. 2000), is documented in a March 2001 letter from Ms. Qualls' treating neurologist, Aplt. App, Vol. 2 at 207, which the ALJ explicitly considered in his decision, *id.* at 17. Abnormal toe signs and asymmetrical deep tendon reflexes are documented, as best we can decipher, in an April 2001 progress note made by Ms. Qualls' treating neurologist, *id.* at 205. Her treating neurologist's 2001 letter and 2001 progress note do not, however, list any work-related limitations associated with her positive Lhermitte's sign, abnormal toe signs, and asymmetrical deep tendon reflexes. (These records also pre-date Ms. Qualls' alleged onset date by nearly three years.) And, there is not a prescription for a cane noted anywhere in the medical evidence. Moreover, where, as here, the ALJ's decision states that he considered all of the evidence, "our general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *see also Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (stating that the "ALJ is not required to discuss every piece of evidence").

-10-

limited daily activities cannot be objectively verified with any reasonable degree of certainty . . . ." *Id.*; *see Wall*, 561 F.3d at 1069-70 (rejecting claimant's argument that ALJ evaluated claimant's credibility under an improper objectively-verified standard, concluding that ALJ's alleged improper standard was merely the ALJ's "observation that [he] would not treat Claimant's testimony as 'strong evidence' of her disability due to his *prior* determination that Claimant's testimony was not 'fully credible'" (emphasis added)). *See also supra* note 3.

The ALJ went on to bolster his adverse credibility finding, stating:

After all, the claimant did testify that she was able to help care for her family, [do] household chores, girl scouts, and sewing. She testified to memory problems but she stated that she was able to sew and use the computer which one would reasonab[ly] assume[] requires concentration and hand dexterity. Additionally, claimant testified that her treating [neurologist] wanted claimant to stop work yet there was no mention of work in any of [the doctor's] notes . . . . Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

The evidence of record clearly shows that claimant has been diagnosed with MS; and claimant's testimony, under oath, [was] that the reason she stopped working was due primarily to her inability to retain information [and the requirement that] she . . . write everything down. During her testimony, claimant did not appear to have any problem understanding the questions from the Administrative Law Judge [or from] claimant's representative. Claimant appeared to be able to respond appropriately to all questions and answered the questions in a logical manner without any

difficulty.[7] It would be reasonable to believe that claimant did not suffer from retention issues as disabling as presented.

Aplt. App., Vol. 2 at 18-19.

As our discussion above demonstrates, and despite the ALJ's use of disfavored language, his ultimate credibility determination is grounded in a thorough analysis that is closely and affirmatively linked to substantial record evidence. *See generally Kepler*, 68 F.3d at 391 (setting forth factors ALJ should consider in making a credibility assessment). Although Ms. Qualls suggests otherwise, this is not a case where "specific facts behind the generalities" regarding her alleged minimal activities of daily living "paint a very different picture" than the one painted by the ALJ. *Krauser v. Astrue*, 638 F.3d 1324, 1332 (10th Cir. 2011).[8]

---

[7]     Ms. Qualls' argument that the ALJ improperly relied on a "'sit and squirm' demand" in noting that she "'did not appear to have any problem understanding questions,'" Aplt. Opening Br. at 33, is without merit. "Although an ALJ may not rely solely on his personal observations to discredit a [claimant's] allegations, he may," as the ALJ in this case did, "consider his personal observations in his overall evaluation of the claimant's credibility." *Qualls*, 206 F.3d at 1373; *see also* SSR 96-7p, 1996 WL 374186, at *8 ("In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject the individual's complaints solely on the basis of such personal observations, but *should consider* any personal observations in the overall evaluation of the credibility of the individual's statements." (emphasis added)).

[8]     Contrary to Ms. Qualls' assertion that it "was never established how often she went [to church]," Aplt. Opening Br. at 30, the consulting psychologist documented Ms. Qualls' "report[]" that she "attends church once a week." Aplt. App., Vol. 2 at 193. Likewise, and contrary to Ms. Qualls' assertion, it is not "well documented in the medical records" that her "symptoms were at times

(continued...)

Further, the ALJ was under no obligation to confirm Ms. Qualls' activities of daily living by contacting Ms. Qualls' mother, the individual that Ms. Qualls had "named for that purpose." Aplt. Opening Br. at 26. Nor does Ms. Qualls offer any authority in support of that argument. *See id.* Similarly, the ALJ was under no obligation to recontact Ms. Qualls' treating neurologist to inquire about why his medical records did not reflect Ms. Qualls' testimony that the treating neurologist did not want her to work, *see id.* at 32, because the evidence from the treating neurologist was not "inadequate to determine if the claimant [was] disabled," *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). *Cf. McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (observing that ALJ had obligation to recontact treating physician if validity of his report was open to question).

Finally, Ms. Qualls contends the ALJ "demonstrated bias" by making up "his mind that [she] was not disabled before hearing the evidence." Aplt. Opening Br. at 35. In support, she cites two statements the ALJ made at the beginning of her administrative hearing: (1) "some people have MS, and work for 20 years"; and (2) "quite frankly, on the medical I have right now, I'd send her

---

[8](...continued)
more severe than others." Aplt. Opening Br. at 28. Rather, the two medical records to which she directs us on this point (one from 2001 and one from 2006) contain isolated self-reports about her symptoms. *See* Aplt. App., Vol. 2 at 173, 206-08.

back to work, okay?" Aplt. App, Vol. 2 at 27, 29. In response, the Commissioner contends that these "stray" remarks, in the context of the entire hearing, show that the ALJ was "commenting on the lack of medical evidence and in fact, told Qualls['] [representative that she] could submit additional evidence." Aplee. Br. at 30. On the facts of this case, we agree with the Commissioner and reject Ms. Qualls' bias argument. Our review of the record reveals that Ms. Qualls "received a full and fair opportunity to develop the record and [to] present" evidence. *Puckett v. Chater*, 100 F.3d 730, 734 (10th Cir. 1996); *see also Harline v. Drug Enforcement Admin.*, 148 F.3d 1199, 1204 (10th Cir. 1998) (observing that ALJ "enjoys a presumption of honesty and integrity").

### *The ALJ's Step Four Determination*

Ms. Qualls raises what appear to be two arguments under the broad category of alleged errors at "steps 4 and 5." Aplt. Opening Br. at 20. First, she takes issue with the ALJ's hypothetical to the VE, asserting that it erroneously omitted specific limitations for physical demands set forth in 20 C.F.R. § 404.1545(b). As a result, she claims we "have no way of knowing what limitations, if any, the VE applied in formulating her answers to the ALJ." Aplt. Opening Br. at 21. Second, she contends the ALJ erroneously failed to consider all of her impairments throughout the disability process, arguing that the ALJ's hypothetical to the VE erroneously omitted "all the limitations of record, even the nonsevere ones." *Id.* at 22. In particular, she challenges the ALJ's omission of

-14-

limitations due to migraine pain, dizziness and vertigo, poor balance, the cyclical nature of MS, and impaired vision.

We understand these arguments to be challenges to the ALJ's RFC assessment. Given the applicable sequential evaluation process, we begin by examining Ms. Qualls' arguments at step four, where she bore the burden of demonstrating "that her impairment prevents her from performing work she has previously performed." *Fischer-Ross*, 431 F.3d at 731; *see also Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (observing that step four "is comprised of three phases": (1) evaluating the claimant's physical and mental RFC, (2) determining the physical and mental demands of claimant's PRW, and (3) determining "whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one").

"In determining a claimant's physical abilities, the ALJ should . . . assess the nature and extent of the claimant's physical limitations and then determine the claimant's residual functional capacity for work on a regular and continuing basis." *Winfrey*, 92 F.3d at 1023 (brackets and internal quotation marks omitted). This involves consideration of the claimant's "impairment(s), and any related symptoms . . . [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

Here, the ALJ indicated that he had carefully considered the entire record and found that between Ms. Qualls' alleged onset date and her DLI, she retained the RFC to perform a full range of light work. *See* 20 C.F.R. § 404.1567(b) (defining light work). In making this finding, the ALJ explained that he had considered all of Ms. Qualls' "symptoms and the extent to which [they could] reasonably be accepted as consistent with the objective medical evidence and other evidence." Aplt. App., Vol. 2 at 15. He detailed her hearing testimony, including subjective complaints; considered her daily activities; documented the medical and other evidence of record, including her medications; adversely assessed her credibility; and evaluated her demeanor. *See* SSR 96-8p, 1996 WL 374184, at *5 (identifying evidence relevant to an RFC assessment).

Prior to posing his hypothetical, the ALJ asked the VE to describe Ms. Qualls' "work history." Aplt. App., Vol. 2 at 48. The VE stated that Ms. Qualls had worked as "a cashier, which is light in exertion, semiskilled, SVP of three[,]" and that she had worked as "customer support, or customer service representative," which is sedentary in exertion, with a SVP of three. *Id.*[9]

---

[9]    The VE also described Ms. Qualls' prior work as a "child care assistant," which the VE explained was medium in exertion with a SVP of five. Aplt. App., Vol. 2 at 48. At the end of the hearing, however, it was clarified that Ms. Qualls had only worked in the childcare position for two weeks, a duration the ALJ found too brief for Ms. Qualls to have acquired the position's required skills. *Id.* at 51. *See* 20 C.F.R. § 404.1560(b)(1) (defining PRW as work that occurred within the past fifteen years, was substantial gainful activity, and that "lasted long

(continued...)

-16-

In his hypothetical, the ALJ asked the VE to consider an individual who

possessed a

> [twelfth] grade education; good ability to read, write, and use
> numbers. She would have the capability of performing -- *are you*
> *familiar with the elements of medium, light, and sedentary work*
> *activity*?
>
> A [VE] *Yes, I am.*
>
>     . . . .
>
> Q [ALJ] Okay. She has been diagnosed as having [an] affective
> disorder; however, it's nonsevere. There would be no work-related
> limitations in that regard. She is taking currently certain medications
> to help her with any symptomatology she might have. The
> medication usage does not interfere with her ability to, to remain
> reasonably alert to perform required functions presented in a work
> setting. Assuming this hypothetical, could she return to any of her
> past relevant work, either as she has described it, or as that work is
> customarily performed?
>
> A [VE] Yes, she could. There are no limitations in that hypothetical
> that would prevent her return to [her past relevant work].

Aplt. App., Vol. 2 at 48-49 (emphasis added).

Based on the foregoing, we reject Ms. Qualls' allegation that we have no

way of knowing what limitations the VE applied in formulating her answers to the

---

[9](...continued)
enough for [the claimant] to learn to do it"); SSR 82-62, 1982 WL 31386, at *2
(1982) (explaining that how long it takes for one to learn to do a job "depends on
the nature and complexity of the work"). When the VE stated that Ms. Qualls had
only worked in the childcare position for two weeks, the ALJ seemingly
dismissed that occupation as exceeding Ms. Qualls' RFC, stating, "that was at
medium, anyway? Was that correct?" The VE responded, "Right." Aplt. App.,
Vol. 2 at 51.

ALJ. The VE specifically testified that she was familiar with the requirements of medium, light, and sedentary work activity, and we are therefore not left to guess what occurred in the VE's head. *Cf. Winfrey*, 92 F.3d at 1025. The limitations the VE applied in formulating her answer are clearly the limitations set forth in 20 C.F.R. § 404.1567 (defining sedentary, light, medium, and heavy work). *See also supra* note 9.

We also reject Ms. Qualls' contention that the ALJ's hypothetical to the VE erroneously omitted "all the limitations of record, even the nonsevere ones." Aplt. Opening Br. at 22. The ALJ's decision does not reflect that he ignored many of Ms. Qualls' so-called "limitations of record," but rather, that he found her subjective complaints and statements concerning the intensity, persistence and limiting effects of her symptoms—including, as he observed, migraines that come and go, double vision; balance problems, problems with numbness, and an inability to retain information—not credible to the extent they were inconsistent with performing a full range of light work. This credibility determination enjoys substantial evidentiary support in the record, as previously detailed. With respect to Ms. Qualls' contention regarding nonsevere impairments, she misrepresents the ALJ's hypothetical. It specifically enumerated Ms. Qualls' affective disorder (depression), the single nonsevere impairment identified by the ALJ. And the ALJ instructed the VE that this nonsevere impairment did not yield any "work-related limitations." Aplt. App., Vol. 2 at 48.

Accordingly, we conclude that the ALJ's hypothetical adequately reflected the "impairments and limitations that [were] borne out by the evidentiary record," and that Ms. Qualls has not identified any reversible error in the ALJ's decision to deny benefits at step four of the sequential evaluation process. *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (citation omitted); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (stating that the ALJ's hypothetical questions "must include all (and only) those impairments borne out by the evidentiary record"). Because we affirm the ALJ's finding of nondisability at step four, we do not need to consider Ms. Qualls' arguments at step five. *See Murrell*, 43 F.3d at 1389 ("[D]ue to the way the sequential analysis is structured, a proper finding of disability (at step three) or nondisability (at steps two, four, or five) is conclusive and, thus, cannot be overturned by consideration of a subsequent step.").

### III.

The judgment of the district court is AFFIRMED.

Entered for the Court

Stephen H. Anderson
Circuit Judge

-19-