**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

DANA FRANKLIN,

        Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

        Defendant-Appellee.

No. 11-6055
(D.C. No. 5:09-CV-01028-D)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

Dana Franklin appeals from an order of the district court affirming the

Commissioner's decision denying her application for Social Security disability

benefits. We affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Background

Ms. Franklin filed for these benefits on April 11, 2007 with an alleged onset date, as amended, of November 18, 2006. She alleged disability based on degenerative disc disease, hypertension, rheumatoid arthritis, anxiety and depression. The agency denied her applications initially and on reconsideration.

On August 13, 2008, Ms. Franklin received a de novo hearing before an administrative law judge (ALJ). The ALJ determined that she retained the residual functional capacity (RFC) to perform light work, with only occasional bending forward at the waist, occasional bending at the knees to come to rest on the knees, occasional downward bending of the legs and spine, and with an ability to concentrate sufficient for unskilled work only. He found that she could return to her past relevant work as a cashier as generally and actually performed. Alternatively, he found that there were a significant number of other jobs that she could perform in the national economy. Applying the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, Subpt. P, App. 2, rule 202.18 (the grids) as a framework, and considering the testimony of a vocational expert (VE) who testified at the hearing, the ALJ concluded that Ms. Franklin was not disabled within the meaning of the Social Security Act. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision.

## II. Discussion

Ms. Franklin raises two issues. She contends the ALJ erred by failing to evaluate properly the opinions of her treating physician, Dr. Thompson. She further argues that the ALJ's analysis of her credibility was contrary to law and unsupported by substantial evidence.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing process). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *Id.* at 751 n.2. If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains a sufficient RFC to perform work in the national economy, given his or her age, education and work experience. *See id.* at 751. The ALJ reached his decision here at steps four (claimant able to perform work she has performed in the past) and five (claimant has RFC to perform other work in the national economy).

Ms. Franklin contends the ALJ erred in evaluating her treating physician's opinion and her testimony in finding she was not disabled at steps four and five.

## A. Treating Physician's Opinions

The record contains a number of medical opinions from Ms. Franklin's treating physician, Dr. Thompson. In reaching his decision, the ALJ assigned little weight to Dr. Thompson's opinions, a determination now challenged by Ms. Franklin.

To properly evaluate the opinion of a treating physician, an ALJ must engage in the following analysis. First, the judge

> must give good reasons in the notice of determination or decision for the weight assigned to a treating physician's opinion. Further, the notice of determination or decision must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quotations, citations, and alteration omitted).

In determining how much weight to give a treating source's opinion, an ALJ must first decide whether the opinion should be given "controlling weight." *Id.* To make this decision, the ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2 (quotation omitted). If the answer to this question is no, then the

controlling-weight analysis is complete. *Watkins*, 350 F.3d at 1300. On the other hand, "[i]f the ALJ finds that the [doctor's] opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record." *Id.*

Finally, even if the ALJ finds the opinion is not entitled to controlling weight, he must still afford it deference and weigh it according to the factors provided in 20 C.F.R. §§ 404.1527. SSR 96-2p, 1996 WL 374188, at *4. These factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quotation omitted). After considering these factors, the ALJ must give good reasons for the weight ultimately assigned to the opinion in the notice of determination or decision.

With these principles in mind, we turn to the ALJ's consideration of Dr. Thompson's medical opinions.

### 1. Memorandum of June 21, 2007

The first opinion is contained in a memorandum Dr. Thompson prepared in which he described Ms. Franklin's diagnoses and the medical tests that supported

them.  In this memorandum, he expressed his opinion that, to "a reasonable degree of medical certainty . . . this long list of intolerable problems has made this relatively young woman totally disabled."  Aplt. App., Vol. II at 229.  The ALJ assigned little weight to this opinion about disability because it was "unsupported by the accompanying treating medical clinic records, as well as invading the ultimate issue of disability as reserved for the determination of the Commissioner."  *Id.* at 16.  Ms. Franklin concedes that issues of total disability are reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(e)(1).  Moreover, other than his conclusory statement that she was "totally disabled," Dr. Thompson did not express any opinion in his June 2007 memorandum concerning Ms. Franklin's physical or mental capabilities.  We conclude that the ALJ's decision to give the opinion expressed in this memorandum little weight is supported by substantial evidence.

### 2.  Medical Source Statements

Dr. Thompson also completed two medical source statements in which he provided specific opinions concerning the effect of Ms. Franklin's impairments on her ability to work.  In the first statement, dated October 22, 2007, he listed her diagnoses as degenerative disc disease of the cervical spine; degenerative joint disease of the lumbar spine; cervical foraminal stenosis at C4-5 and C6; mixed connective tissue disease; hypertension; hyperlipidemia; fibromyalgia; and fibrocystic mastopathy.  He opined that she could sit for one to two hours at a

time, and for three to four hours total in an eight-hour day; walk 100 yards at one time; stand for thirty minutes to an hour at one time and for three to four hours total in an eight-hour day; and lift five to ten pounds. Dr. Thompson further opined that she could not complete a normal work week without marked interruptions, due to her pain, weakness and fatigue, and would require more than the typical number of breaks during an eight-hour workday.

In his second statement, dated July 28, 2008, Dr. Thompson identified a slightly different list of medical diagnoses: degenerative joint and disc disease; status post cervical disc surgery; cervical and lumbar radiculopathies; chronic pain management; hypertension; and depression. In this statement, his estimates of Ms. Franklin's physical limitations were similar to those contained in his previous statement, but he now opined that she could only stand for one to two hours total per day "in short segments." Aplt. App., Vol. II at 345. He again stated that she could not work a normal work week without an unreasonable number of work periods, because of chronic pain and the side-effects of her medications, which made it difficult for her to concentrate. He specified that her medications caused poor concentration, drowsiness, and short-term memory loss.

The ALJ gave these opinions some, but not great, consideration in calculating Ms. Franklin's RFC. He explained:

> [T]hese findings are not consistent with Dr. Thompson's treating office and narrative notes which document palliative care for continued medication management. Dr. Thompson's less than

sedentary findings are not supported by the remainder of the medical evidence. Although the claimant had an anterior cervical fusion, the objective MRI studies documented the claimant had mild to moderate stenosis. Post-operatively, the neurosurgeon found the claimant had good results, and even Dr. Thompson noted the claimant had fifty percent reduction in her symptoms. Additionally, these findings appear to have been based upon the claimant's subjective complaints rather than upon objective diagnostic criteria.

*Id.* at 15.

Ms. Franklin asserts that this analysis "was legally insufficient because it did not provide specific and legitimate reasons for rejecting those opinions, and because it did not properly evaluate the opinions under the relevant factors." Aplt. Opening Br. at 27. While this appears a procedural objection, targeting an alleged failure to follow the procedure required for evaluating treating physician opinions, Ms. Franklin in fact primarily relies on substantive challenges to the ALJ's reasoning and conclusions.

She first objects to the ALJ's conclusion that Dr. Thompson provided only palliative medication management. She argues that Dr. Thompson also performed various tests and "communicated with neurosurgeon Dr. Cagle." *Id.* at 28. Her objections, however, do not suggest that Dr. Thompson himself provided curative treatment that went beyond managing Ms. Franklin's medications. In assessing a physician's opinion, the ALJ is entitled to consider the nature of the treatment provided. 20 C.F.R. § 404.1527(d)(2)(ii). We discern no error here.

Dr. Cagle did provide surgical treatment that went beyond palliative care, in the form of spinal fusion surgery. But as the ALJ noted, Dr. Cagle's post-surgical communications about Ms. Franklin's condition were highly positive. Approximately one month after the surgery, he reported that Ms. Franklin had made good progress, had good relief of her neck and arm pain, that her surgical wound was well-healed, and that her strength and sensation were good. In a letter to Dr. Thompson, he reported that Ms. Franklin had good relief of neck and arm pain and had little residual pain.

Ms. Franklin also complains that the ALJ failed to specifically discuss Dr. Thompson's examination findings of other evidence relating to pain, arthritis, and depression. Aplt. Opening Br. at 28. While the ALJ is not strictly required to discuss every examination finding in assessing a treating physician's opinion, he should do so if these examination findings are significantly probative and hence relevant to his assessment of the opinion under the appropriate standards will failure to discuss them be significant. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).

Ms. Franklin attempts to make such a showing of relevance by asserting that the test results, which the ALJ failed specifically to discuss, undercut his statement that Dr. Thompson based his opinions on her subjective complaints rather than on objective diagnostic criteria. But the ALJ's opinion describes his overall evaluation of the proffered medical records. Although the explanation

could have been more robust, the opinion demonstrates a review of all of Dr. Thompson's opinions and consideration of their weight in light of all the evidence in the record.

Ms. Franklin also attacks the ALJ's finding that the remaining medical evidence did not support Dr. Thompson's opinions. First, she claims the ALJ incorrectly found that the MRI studies showed the degree of her cervical stenosis was only mild to moderate. She argues that pre-operative findings made prior to her alleged onset date reflected severe or moderate-to-severe neuroforaminal narrowing that was more severe than the ALJ's "mild-to-moderate" formulation would indicate. She also argues that these pre-operative findings indicated cord compression affecting at least four levels of her cervical spine, rather than the two levels affected by the cervical fusion. We fail to see how these pre-operative findings cast doubt on the ALJ's rationale.

First, with regard to her argument that the ALJ gave insufficient attention to all four levels affected by spinal stenosis, Ms. Franklin does not show that the ALJ's reasoning was unsupported by substantial evidence. Dr. Cagle, who performed the cervical surgery, opined prior to the surgery that "[a] cervical spine MR scan shows cervical disc disease with spinal stenosis at C5-6 greater than at C4-5. There are *milder changes above and below*." *Id.* at 314 (emphasis added). Based on this understanding, Dr. Cagle offered Ms. Franklin an anterior cervical fusion at C4-5 and C5-6. *Id.* The ALJ was entitled to rely on Dr. Cagle's opinion

-10-

that these were the levels at which spinal stenosis was sufficiently severe to require surgical treatment. They were in fact the levels on which surgery was actually performed.

Second, the ALJ's discussion of the MRI studies must be considered in light of the overall medical record. These studies were performed before the alleged onset date and before Ms. Franklin's cervical fusion. The cervical fusion occurred less than four months after the alleged onset date, and as the ALJ noted, it provided Ms. Franklin with significant pain relief, at least initially.

Even if the most recent pre-onset MRI result showed severe stenosis at some levels and moderate stenosis at others--rather than mild-to-moderate stenosis as the ALJ characterized it--we discern no reversible error in his characterization of the result. The MRI report's findings, which supported the ALJ decision, contained the following:

> C3-4: Combination broad-based disc osteophyte complex and small central disc protrusion. Central/left parasagittal disc protrusion. *Mild central canal stenosis* with an AP diameter of 9 mm. Disc abuts and perhaps minimally contours the anterior aspect of the cervical cord. *Mild to moderate* right and moderate left foraminal stenosis secondary to facet/uncovertebral degenerative changes.

> C4-5: Broad-based disc osteophyte complex and small to moderate sized right parasagittal disc protrusion. *Moderate* central canal stenosis with an AP diameter of 8 mm. *Mild* compression of the anterior aspect of the cervical cord. *Moderate* right and *moderate* left foraminal stenosis secondary to facet/uncovertebral degenerative changes.

-11-

C5-6:  Broad-based disc osteophyte complex.  *Moderate* central canal stenosis with an AP diameter of 8 mm.  *Mild* compression of the anterior aspect of the cervical cord.  Severe bilateral foraminal stenosis secondary to facet/uncovertebral degenerative changes.

C6-7:  Broad-based disc osteophyte complex and *small* central disc protrusion.  *Mild* central canal stenosis with an AP diameter of 9 mm.  *Mild* right and moderate to severe left foraminal stenosis secondary to facet/uncovertebral degenerative changes.

*Id.* at 315 (emphasis added).

Thus, although there were a few references to severe stenosis in the MRI report, the vast majority of references support the ALJ's characterization of mild or moderate stenosis.  Moreover, the medical record as a whole contains no objective post-surgical testing revealing continued impact from severe stenosis of the cervical spine.  Rather, both the initial subjective reports and post-surgical objective indications suggest a positive surgical outcome with good relief of pain.  *See id.* at 237 ("[Ms. Franklin reports] 50% relief of [symptoms] post op"); 308 ("[Ms. Franklin] has done well with good relief of her neck and arm pain.  She has a little residual pain, which is not remarkable"); 309 ("good symptomatic relief of her neck and arm pain . . . strength and sensation are good"); 312 ("anterior screw and plate fixation with intervertebral bone plug positioning at C4, C5, and C6 with good anatomic alignment of the vertebral bodies").

Ms. Franklin complains, however, that the ALJ ignored her continued post-operative pain "with objective findings of sacroiliac tenderness and inflammation, reduced cervical and lumbar mobility, and positive trigger points."

-12-

Aplt. Opening Br. at 30. She contends that this lacuna in his analysis made the ALJ's reasons for rejecting Dr. Thompson's opinions "not sufficiently legitimate and therefore legally improper." *Id.* But the ALJ did provide an adequate discussion of the medical evidence (including the opinions of, and treatment notes from, Dr. Thompson) bearing upon her reduced mobility, fibromyalgia (associated with the positive trigger points), and post-operative pain. *See* Aplt. App., Vol. II at 15. While Ms. Franklin may not agree with the ALJ's conclusions, she is incorrect in stating that he "ignored" these conditions or symptoms.

Ms. Franklin was examined post-operatively by consulting physician Dr. Dennis Brennan. He described her pain complaints and her medical history. He noted that her range of motion in extension and left and right side bending appeared normal and her straight leg raising tests were negative, though she did complain of pain while undergoing testing. She had some limitation on flexion/extension and rotation in her cervical spine and tenderness on palpation in the cervical musculature and paraspinal musculature throughout her thoraco/upper lumbar area. But there was no evidence of sacroiliac tenderness, trigger point tenderness, or radiculopathy, and she "appear[ed] to ambulate in a steady and safe gait at an appropriate speed without the use of any assistive devices." *Id.* at 206.

Ms. Franklin complains, however, that the ALJ mischaracterized and failed to discuss Dr. Brennan's mobility findings. She does not argue that these mobility findings are inconsistent with the ALJ's RFC. Nor does she explain how

-13-

they necessarily undermine the ALJ's conclusion that Dr. Thompson's less-than-sedentary findings were unsupported by the remainder of the medical evidence. We therefore conclude she has failed to show reversible error on this point relating to the treating physician analysis.

Similarly, Ms. Franklin's protestations that she has had many medical visits over the years for her physical conditions (averaging about ten per year from 2003 to 2008), and that she has taken many medications for these conditions, do not demonstrate reversible legal error in the ALJ's treating physician analysis. The ALJ was not required to quantify precisely the number of times Dr. Thompson saw Ms. Franklin, and there is no indication he concluded that Dr. Thompson's consultation with her was a limited one.

The ALJ also acknowledged possible limitations on Ms. Franklin's ability to concentrate, which Dr. Thompson had noted would be a side-effect of her medication, by including in his RFC a limitation that she "is able to sustain concentration necessary for [only] unskilled work." *Id.* at 12. This evaluation was supported by substantial evidence. During his examination of Ms. Franklin, Dr. Brennan found her "alert and oriented," with clear sensorium and one hundred percent intelligible speech. *Id.* at 205.

In sum, we conclude that Ms. Franklin has failed to demonstrate reversible legal error or lack of substantial evidence in the ALJ's treating physician analysis.

**B. Credibility Analysis**

Ms. Franklin also argues the ALJ did not properly analyze her pain complaints. "A claimant's subjective allegation of pain is not sufficient in itself to establish disability." *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993). Instead, "[b]efore the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Id.* (citations omitted). Under the applicable procedure, the ALJ was therefore required to consider and determine (1) whether Ms. Franklin established a pain-producing impairment by objective medical evidence; (2) if so, whether there was a "loose nexus" between that impairment and her subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Ms. Franklin's pain was in fact disabling. *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987).

> Here, the ALJ concluded:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained.

Aplt. App., Vol. II at 13.

-15-

The ALJ further explained:

> In the instant case, the issue is not the existence of pain, but rather the degree of incapacity incurred because of it. While the claimant complains of severe pain, it does not seem reasonable to conclude from the minimal findings in evidence that such could be the basis for the degree of pain alleged. She does not appear to be experiencing progressive physical deterioration which might be expected when there is intense and continuous pain. Likewise, the claimant's routine does not appear restricted by her alleged disability, but rather by choice.

*Id.* at 14.

Thus, the ALJ did not believe Ms. Franklin's allegations of disabling pain at step three of the *Luna* analysis. To determine the credibility of a claimant's complaints of disabling pain, the ALJ should consider such factors as "the levels of [her] medication and [its] effectiveness, . . . the frequency of [her] medical contacts, the nature of [her] daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). *See also* 20 C.F.R. § 404.1529(c)(3) (listing seven factors relevant to claimant's symptoms that the ALJ will consider); SSR 96–7p, 1996 WL 374186, at *3 (same).

Ms. Franklin first argues that the ALJ's conclusion that the "minimal findings in evidence" were inconsistent with her level of pain is unreasonable given the evidence as a whole. She contends that the findings supporting her claim of disabling pain were far from minimal. In her brief, she lists a number of

-16-

conditions with which she has been diagnosed over the years. *See* Aplt. Opening

Br. at 41-42. But the ALJ's statement should be read to mean that there were

insufficient medical findings supporting the alleged severity of these impairments

to justify the degree of disabling pain alleged. This conclusion is supported by

substantial evidence, particularly given the opinions and medical treatment notes

of Drs. Cagle, Brennan, and the RFC assessment of the agency's non-examining

physician Dr. Thurma Fiegel.

Ms. Franklin also complains that the ALJ's finding of a lack of progressive

physical deterioration accounting for her pain was incorrect. She relies on the

worsening problems leading to her February 2007 neck surgery. Her argument

fails to account for the improvement in her neck problems noted as a result of the

surgery. While it is true that she continued to experience pain and the need for

narcotic medication after the surgery, she fails to explain how this represents

"physical deterioration" over time, contrary to the ALJ's finding.

Ms. Franklin complains that the ALJ's finding that she restricts her

activities by choice rather than because of her disability is unsupported by

substantial evidence. Although there was no direct testimony that she "chooses"

to lead a physically restricted existence, the ALJ's point was that her restricted

routine was not *compelled* by her impairments. This conclusion is supported by

the medical evidence that the ALJ accepted and discussed.

Ms. Franklin also attacks the ALJ's summary of, and conclusions from, her hearing testimony. The ALJ provided a detailed and generally accurate summary of this testimony. But Ms. Franklin complains that the ALJ

> failed to mention [her] inabilities to vacuum or carry laundry, that even prolonged footstool use could aggravate her back pain, her usually being accompanied in the rare event she went shopping given that her husband usually did this task, that she was provided accommodations at church for her difficulties with prolonged standing and sitting (including a special pillow for the latter), and having to stand during movies.

*Id.* at 43.

Ms. Franklin testified that there are some household chores she can do, and some she cannot. Aplt. App., Vol. II at 26. She stated she cannot vacuum. She can do laundry if her husband loads the washer and moves the laundry from the washer to the dryer. Her problem is that she cannot do the bending required for doing the laundry. *Id.* The ALJ took this limitation into account when he limited the amount of bending she could do in the RFC. *See id.* at 12.

The ALJ noted that Ms. Franklin sits on a chair with a footstool. She complains, however, that he failed to mention that sometimes she has to put down the footstool because it starts "pulling" on her back. *Id.* at 27. Ms. Franklin did not say how often this occurs. The ALJ elsewhere noted her testimony that she cannot sit for more than an hour without changing position. We fail to see how his failure to mention this detail involving the footstool robbed the ALJ's analysis of substantial evidence.

The ALJ noted Ms. Franklin's testimony that "she can go shopping, but not for very long." *Id.* at 13. She complains he failed to mention "her usually being accompanied in the rare event she went shopping given that her husband usually did this task." Aplt. Opening Br. at 43. First, the ALJ only said that Ms. Franklin "can" go shopping, not that she does so frequently. Nor did Ms. Franklin testify that it was a "rare event" for her to go shopping, as she now contends. While she did state that her husband "usually" does the shopping, her ambiguous testimony suggests he may do so by accompanying her with him driving to the grocery store and carrying the heavy objects once they get there. *See* Aplt. App., Vol. II at 27.

Ms. Franklin also complains that the ALJ did not mention the fact that she has to use a special pillow when sitting at church and to stand sometimes at the movies. But he did note her testimony that she could sit for less than an hour without changing positions (less time than the duration of most church services or movies) and could stand for only about thirty minutes.

Finally, Ms. Franklin complains that when he assessed the severity of her mental impairments, the ALJ stated she "does not require custodial care for her personal needs." *Id.* at 11. She argues that she needed assistance from her husband with some activities of dressing, bathing, and shaving her legs. We perceive no inconsistency here with a finding that Ms. Franklin does not require *custodial care*.

In sum, the ALJ's analysis of Ms. Franklin's credibility was supported by substantial evidence.

### III. Conclusion

The judgment of the district court is therefore AFFIRMED.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge